(No. 32649.— )

JEWEL TEA Co., INC., Appellant, *vs.* RICHARD YATES ROWE, State Treasurer, *et al.,* Appellees.

*Opinion filed March 23, 1953—Rehearing denied May 18, 1953*

BROWN, HAY & STEPHENS, of Springfield, and JOHN W. UNGER, of Barrington, (JOHN B. STODDART, JR., of counsel,) for appellant.

IVAN A. ELLIOTT, Attorney General, of Springfield, (WILLIAM C. WINES, and JOHN T. COBURN, of counsel,) for appellees.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

This appeal involves a dispute as to the amount of additional franchise tax due as a result of certain transactions with respect to the capital stock of the Jewel Tea Co., Inc., a New York corporation, and as to the proper method of reporting those transactions to the Secretary of State. The company made the reports in the manner required by the Secretary of State and paid, under protest, the amount of tax demanded by him. It then filed a com-

plaint in the circuit court of Sangamon County to restrain payment into the State treasury and to secure a refund of the disputed amount. Evidence was heard and a decree was entered dismissing the complaint. The company has appealed.

The transactions about which the controversy centers occurred in June of 1947. Prior to that time the stated capital of the company, as defined by the Business Corporation Act, (Ill. Rev. Stat. 1947, chap. 32, par. 157.2,) and as shown by the company's annual report filed in February of 1947, was $10,770,073.27. This capitalization consisted of 50,000 shares of 4¼% cumulative preferred stock, each share having a par value of $100, and 560,000 shares of common stock without par value. The company had no paid-in surplus. The percentage of its stated capital represented in Illinois, under the statutory formula, was 60.462 per cent. At some unspecified date prior to June 13, 1947, the company paid in advance its annual franchise tax for the period from July 1, 1947, to July 1, 1948, computed upon its stated capital as shown in its annual report.

On June 13, 1947, a certified copy of an amendment to the company's certificate of incorporation was filed with the Secretary of State of the State of New York. The certification was dated June 11, 1947. Concerning the 50,000 shares of 4¼% cumulative preferred stock, the amendment stated, "All of such shares have been redeemed or purchased and none are outstanding. All of the said 50,000 shares of 4¼% Cumulative Preferred Stock are to be eliminated by the filing of this Certificate." The certificate also stated that the stockholders, at a special meeting on June 9, 1947, had authorized the issuance of 75,000 shares of 3¾% cumulative preferred stock having a par value of $100 per share.

On August 5, 1947, the company submitted to our Secretary of State a certified copy of the amendment which had been filed with the Secretary of State of New York

on June 13, 1947, together with a form captioned "Report of Issuance of Shares and Increases in Stated Capital and Paid-In Surplus." A covering letter asserted that, under the certificate, the capital of the company had been increased by $2,500,000 and that, consequently, the report required by section 117 of the Business Corporation Act was enclosed, together with the fees and additional franchise tax in the sum of $1281.56 due to the State as the result of the changes. This report set forth that the amount of stated capital and paid-in surplus as last reported was $10,770,073.27. Referring to the 50,000 shares of 4¼% cumulative preferred stock, a footnote in the report stated, "These shares were eliminated simultaneously with the issuance of the new 3¾% Cumulative Preferred Stock." The report further stated that the aggregate number of shares not previously reported as issued was 75,000, the value of the consideration received therefor being $7,500,000 and that, giving effect to the changes described, the amount of stated capital and paid-in surplus was $13,270,073.27.

The Secretary of State declined to accept this report and the accompanying remittance, on the grounds that the Business Corporation Act requires that any reduction in the number of shares issued or in the amount of stated capital and paid-in surplus be reported under section 119, and any increases be reported on a report of issuance of shares under section 117; that it would be necessary for the company to submit a report under section 119 covering the redemption and cancellation of the 50,000 shares of 4¼% preferred stock, and also a report of issuance of shares, under section 117, showing the issuance of the 75,000 new preferred shares.

On August 28, the company forwarded to the Secretary of State, as requested, a report of change in stated capital and paid-in surplus under section 119, and a report, under section 117, of issuance of shares and increase in stated capital and paid-in surplus. The report filed under sec-

tion 119 stated that all of the 50,000 shares of 4¼% preferred stock were eliminated by a certificate filed with the Secretary of State of New York on June 13, 1947, and the stated capital of the corporation thereby reduced by $5,000,000; that, giving effect to the changes reported, the aggregate number of issued shares of the company was 560,000 shares of common stock without par value, and that the amount of stated capital and paid-in surplus was $5,770,073.27. The report filed under section 117 fixed the amount of stated capital as last reported to the Secretary of State at $5,770,073.27, described the issuance of the $7,500,000 3¾% preferred stock, and fixed the stated capital, after giving effect to these changes, at $13,270,073.27. The letter accompanying these reports stated that they were being filed solely because of the Secretary of State's "illegal and unconstitutional" insistence that they be executed in this manner, and that for the same reason, a check for $2947.18, the total amount of fees, additional franchise tax, and penalties, was being delivered under protest.

Concerning the events which took place in New York on June 13, 1947, the general counsel of the company testified at the trial that the certificate of the amendment which the shareholders had approved on June 9, 1947, was taken to the office of the Secretary of State in Albany, but was not filed until directions to do so were given by telephone by the witness who was in New York City. During this telephone conversation on June 13, 1947, and just before the filing of the certificate was directed, the company delivered to the redemption agent a check for $5,000,000 for redemption of the 4¼% preferred stock. Apparently at the same time the company received a check for $7,500,000 from the underwriters in payment for the new 3¾% preferred stock. The witness also testified that it was agreed between the underwriters and the company that these transactions would be considered from a legal standpoint as being simultaneous, adding, "it was merely a question of

crossing checks, because the underwriters were not obligated to buy the new preferred stock until they had evidence of the elimination of the old. On the other hand, we weren't willing to redeem the old stock until we had the check ready for delivery to us for the new preferred stock, as we did not have an extra five million dollars available for this purpose without applying the proceeds, and in fact, had no authority to do so from our Board of Directors."

The basic dispute between the parties concerns the way in which the changes which took place in the capital structure of the company are to be regarded for the purpose of computing the amount of additional franchise tax due. Emphasizing the precautions employed to insure that the delivery of the $5,000,000 check to the redemption agent for the redemption of the old stock and the receipt of the $7,500,000 check from the underwriters for the new stock should coincide as closely as possible, the company argues that the transactions should be regarded for taxing purposes as "simultaneous," as the company and the underwriters had agreed that they should be regarded. So viewed, the company argues that the net effect of what occurred was an increase of $2,500,000 in its stated capital, and that the transactions were properly reported and were taxable on that theory.

The defendants argue that the redemption of the old stock and the issuance of the new were separate transactions and that the facts stated in the operative document filed in New York, the State of incorporation, conclusively so demonstrate. Regarding the redemption of the old stock and the issuance of the new as separate transactions, the defendant argues that the statute required them to be so reported and so treated in determining the amount of the additional franchise tax due.

Analysis of the applicable statutory provisions satisfies us that the company's contention cannot be sustained. Section 117 requires foreign corporations to file reports upon

(1) the issuance of shares not previously reported to the Secretary of State; (2) an increase in stated capital or paid-in surplus, or both, without the issuance of shares, and (3) an exchange or reclassification of shares resulting in an increase in the amount of stated capital or paid-in surplus, or both. (Ill. Rev. Stat. 1947, chap. 32, par. 157.117.) It is clear that neither the second nor the third contingency has occurred. Plaintiff issued 75,000 shares not previously reported to the Secretary of State and therefore it was necessary for it to file a report under section 117. That section contains no provision directly or indirectly applying to a redemption of outstanding shares by a corporation. On the other hand, section 119 specifically provides for an additional report of changes in stated capital and paid-in surplus by a foreign corporation whenever it shall (1) be a party to a statutory merger and become the surviving corporation; (2) effect a reduction in the amount of its stated capital or paid-in surplus, or both, by the redemption and cancellation of its shares; or (3) effect any formal change in the aggregate of its stated capital and paid-in surplus, by amendment to its articles of incorporation or in any other manner permitted by the laws of the place where organized, and such change is not reported to the Secretary of State by any other report required by the act to be filed. (Ill. Rev. Stat. 1947, chap. 32, par. 157.119.) The qualification in clause (3) that no report is required under section 119 if the change has been reported "by any other report required by this Act to be filed" refers only to the third clause of the section. Business Corporation Act, Annotated, original ed. p. 347.

There can be no doubt that what was reported by the company to New York was a reduction of $5,000,000 in capital by the redemption of its outstanding preferred stock, followed by the issuance of $7,500,000 of new preferred stock. The operative document filed with the Secretary of

State of New York was dated June 11, 1947, and was captioned "Certificate of (1) Elimination of Shares Previously Authorized and Reduction of Capital; (2) Authorization of New Shares of Preferred Stock and Classification thereof; * * *." It recited that the amount of the capital of the company had previously been $10,770,073; that all of the shares of 4¼% preferred stock "have been redeemed or purchased and none are outstanding," and that "The amount to which the capital of the Company is reduced is $5,770,073." It also stated, "The surplus, if any, resulting from the reduction of capital hereunder prior to issuance of shares of the new Preferred Stock authorized hereunder, shall be available to be used for any purpose for which surplus may be used." Unmistakably, what occurred and what was reported to New York was a reduction in capital to $5,770,073 by redemption of the $5,000,000 of 4¼% preferred stock, followed by the issuance of $7,550,000 of new 3¾% preferred stock.

The Illinois statute thus covers the exact occurrences which took place, and a report in each of the two sections is clearly required by the statute. We see nothing in the act to suggest that these transactions should be viewed here in a different light than they were regarded in the State of incorporation. Section 138 of the act imposes an additional franchise tax upon the occurrence of any of the three events described in section 117. So far as here pertinent, section 139 of the act fixes, as the base of the additional franchise tax, the increased amount of stated capital and paid-in surplus in Illinois as disclosed by a report of issuance of additional shares. Such a report, under section 117, is required to state the amount of stated capital and paid-in surplus "as last reported to the Secretary of State in any document required by this Act to be filed, other than an annual report." The report is then required to state the number of new shares issued and the

consideration received therefor, and finally, to state the amount of stated capital and paid-in surplus after giving effect of the changes reported.

The company contends, however, that it is entitled to a reduction of $5,000,000 in determining the base upon which the additional franchise tax is to be computed, because its total stated capital never exceeded $13,270,073.27, and because it had already paid an annual franchise tax for the fiscal year beginning July 1, 1947, upon a total stated capital of $10,770,073.27, which included $5,000,000 of old preferred stock which was supplanted by $5,000,000 of the new issue of $7,500,000. So it arrives at the figure of $2,500,000 as the proper base for its additional franchise tax. The first difficulty with this argument is that it contradicts the facts as the company reported them to the State of incorporation: a reduction of the company's capital from $10,770,073.27 to $5,770,073.27 and a subsequent increase of $7,500,000 to a new total of $13,270,073.27. And as we have pointed out, we find nothing in the law of Illinois to justify treating the transaction differently here than it was treated by the State of incorporation. The second obstacle to the company's contention is that the "additional franchise tax" and the "annual franchise tax" are levied as separate taxes, (Ill. Rev. Stat. 1947, chap. 32, pars. 157.138, 157.139,) and no provision exists for applying an overpayment on the one tax as a credit upon the other.

To the extent that the combined total of the annual franchise tax and the additional franchise tax here involved is excessive, the excess is in the amount of the annual franchise tax which the company voluntarily paid in advance upon a capitalization of $10,770,073.27, and not in the additional franchise tax. The statute provides that the annual franchise tax of a foreign corporation is due on July 1, and that the tax is to be computed on the basis of "its stated capital and paid-in surplus on the thirty-first

day of December of the preceding calendar year, minus the amount by which the sum of the stated capital and paid-in surplus may have been reduced after the thirty-first day of December of the preceding calendar year and prior to the twenty-fifth of June of the current calendar year, * * *." (Ill. Rev. Stat. 1947, chap. 32, par. 157.139.) For reasons not apparent in this record, the company did not choose to secure the reduction in its annual franchise tax for 1947-1948 which was thus plainly available to it under the statute. Had it seen fit to do so it would then have made no substantial difference whether the annual tax was computed on a total of $13,270,073.27, or whether the annual tax was computed on $5,770,073.27 and an additional franchise tax assessed upon the new issue of $7,500,000, because both the annual franchise tax and the additional franchise tax are levied at the same rate. (Ill. Rev. Stat. 1947, chap. 32, par. 157.140.) But the company cannot now secure the benefit which it might have had for the asking in the computation of its annual franchise tax, by distorting the facts upon which its additional franchise tax is to be computed.

The company's argument that computation of the additional franchise tax upon the basis of $7,500,000 violates the State and Federal constitutions requires no discussion, for no such contention was appropriately presented to the trial court. We have repeatedly held that a generalized charge of unconstitutionality, which is the most that a liberal construction can read into the complaint in this case, is insufficient to raise a constitutional question. *Lutkus* v. *Department of Finance,* 385 Ill. 221.

It follows that the decree of the circuit court dismissing the complaint was correct, and it is affirmed.

*Decree affirmed.*