No. 2--05--1206     Filed:  6-15-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| NDC LLC, d/b/a Nalco NDC LLC, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 04--L--620 |
| | ) | |
| JUDY BAAR TOPINKA, as Treasurer of | ) | |
| the State of Illinois, and JESSE WHITE, as | ) | |
| Secretary of State of Illinois, | ) | Honorable |
| | ) | Edward R. Duncan, Jr., |
| Defendants-Appellants. | ) | Judge, Presiding. |

PRESIDING JUSTICE GROMETER delivered the opinion of the court:

This appeal involves a dispute as to the amount, if any, of additional franchise tax due under the Illinois Business Corporation Act of 1983 (Business Corporation Act) (805 ILCS 5/1.01 et seq. (West 2004)) as a result of the merger of Nalco Neighborhood Development Corporation (Neighborhood) into plaintiff, NDC LLC, d/b/a Nalco NDC LLC (NDC or plaintiff).  NDC filed a multiple-count complaint against defendants, Judy Baar Topinka, as Treasurer of the State of Illinois (Treasurer), and Jesse White, as Secretary of State of Illinois (Secretary), pursuant to the State Officers and Employees Money Disposition Act (Protest Act) (30 ILCS 230/1 et seq. (West 2004)), seeking, inter alia, reimbursement of additional franchise taxes paid, under protest, on Neighborhood's behalf.  Defendants appeal from the order of the circuit court of Du Page County

granting plaintiff's motion for summary judgment. For the reasons set forth below, we affirm in part, reverse in part, and remand with directions.

## I. BACKGROUND

The following facts are taken from the pleadings, depositions, affidavits, and exhibits contained in the record on appeal. Prior to March 2004, Neighborhood was a Delaware corporation authorized to do business in Illinois. Neighborhood was a subsidiary of Nalco Company and had its principal place of business in Naperville, Illinois. Beginning in October 2003, Neighborhood underwent a corporate reorganization. Before the reorganization, Neighborhood had reported to the Secretary paid-in capital in the amount of $509,997, represented by 20 shares of $1 par value common stock. As part of the reorganization, Neighborhood cancelled all of its then-outstanding 20 shares of $1 par value common stock and authorized the issuance of 40,000 shares of new $0.01 par value common stock. On or about October 31, 2003, Neighborhood issued 10 shares of $0.01 par value common stock in exchange for the 20 shares of the outstanding $1 par value common stock. On November 4, 2003, Neighborhood issued 6,036.46 shares of its $0.01 par value common stock in exchange for consideration in the amount of $301,823,000. On November 11, 2003, Neighborhood issued 22,650 shares of its $0.01 par value common stock in exchange for consideration in the amount of $1,132,867,759. As a result of these transactions, Neighborhood's paid-in capital increased from $509,997 to $1,435,200,756. In furtherance of the corporate reorganization, on March 29, 2004, Neighborhood was merged into NDC, a newly formed Delaware limited liability company. NDC, whose principal place of business was also in Naperville, was created immediately prior to the merger and pursuant to an "Agreement and Plan of Merger" between NDC and Neighborhood. On March 29, 2004, Neighborhood and NDC filed with the appropriate

Delaware authority a "Certificate of Merger of Nalco Neighborhood Development Corp. into NDC LLC" (Certificate).

On March 30, 2004, the Certificate was submitted to the Secretary's Department of Business Services (Department). An employee of the Department issued a handwritten note indicating that the Department would not accept the Certificate until form BCA--14.30 was filed, showing any changes to Neighborhood's paid-in capital that had occurred since the filing of Neighborhood's last annual report. Form BCA--14.30, captioned "Cumulative Report of changes [sic] in Issued Shares and Paid-In Capital," requires the payment of additional franchise tax if the cumulative change to paid-in capital during certain specified reporting periods is positive. See www.cyberdriveillinois.com/publications/pdf_publications/bca1430.pdf. Early in May, NDC prepared a draft of form BCA--14.30, in the name of Neighborhood, showing the changes that had occurred to Neighborhood's paid-in capital, including the increases and the decreases in paid-in capital resulting from the reorganization and merger. A net decrease in paid-in capital was reported on the draft form, resulting in no franchise tax due and owing. Pursuant to an informal practice, NDC tendered the draft to the Department. At that time, Robert Durchholz, the head of the Department's corporate division, told NDC that the proposed reduction in paid-in capital did not comply with the Business Corporation Act. Thereafter, a representative of NDC met with Durchholz to discuss the proposed filing. Durchholz stated that the form would not be approved for filing as long as it showed a reduction in paid-in capital resulting from the merger.

On May 28, 2004, NDC tendered for filing under protest form BCA--14.30, showing the changes to Neighborhood's paid-in capital from April 1, 2003, through and including March 29, 2004, the date of the merger, but not including the effect of the merger itself. NDC indicated on the

form that it was being "filed under protest because taxpayer is entitled, and should have been allowed, to report a reduction in paid-in capital on this form in the amount of $1,435,200,756." NDC included a statutory "Notice of Payment Under Protest" and a corresponding check in the amount of $2,152,041, which included a $5 filing fee. See 30 ILCS 230/2a.1 (West 2004). Later that day, Durchholz rejected in writing the form and payment, stating that the form would not be accepted unless the protest language were removed and the $5 filing fee were omitted from the protested payment. Whereupon, NDC tendered for filing the same form without the protest language as well as a check for $2,152,041, of which $2,152,036 (the disputed tax) was paid under protest pursuant to the Protest Act. Durchholz approved the form for filing on May 28, 2004, and accepted the "Notice of Payment Under Protest" and corresponding retendered check. NDC's payment was placed by the Treasurer in a special fund known as the "protest fund" for 30 days from the date of payment under protest, pending entry of an order for injunctive relief. See 30 ILCS 230/2a (West 2004).

On June 11, 2004, NDC filed a four-count complaint in the circuit court of Du Page County. The complaint, which named the Treasurer and the Secretary as defendants, sought a preliminary injunction restraining the transfer of the disputed tax from the protest fund until the entry of a final order or judgment in this action. NDC also sought a determination by the court as to the proper disposition of such monies. According to NDC, the reduction in paid-in capital Neighborhood experienced when it was merged into NDC could be used to offset increases in Neighborhood's paid-in capital resulting from the reorganization occurring during the same taxable period. See 805 ILCS 5/14.30 (West 2004). Plaintiff also argued that (1) the franchise tax was improperly imposed on NDC, which, as a limited liability company, was not subject to the tax, and (2) the Secretary's

interpretation and application of the Business Corporation Act violated the uniformity clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IX, §2) and/or the equal protection clauses of the United States and Illinois Constitutions (U.S. Const., amend XIV; Ill. Const. 1970, art. I, §2). On June 15, 2004, the trial court entered a preliminary injunction enjoining the Treasurer from transferring out of the protest fund the money paid by NDC under protest.

On October 15, 2004, defendants filed a motion to dismiss NDC's complaint pursuant to sections 2--619(a)(1) and 2--619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2--619(a)(1), (a)(9) (West 2004)). In their motion, defendants argued that (1) the matter was not ripe because the Secretary had not "given written notice of any disapproval as to Neighborhood's filing" and (2) plaintiff's payment of the disputed tax was voluntary. The trial court denied defendants' motion to dismiss. Subsequently, the parties filed cross-motions for summary judgment. On November 4, 2005, the trial court granted plaintiff's motion for summary judgment and denied defendants' motion. Thereafter, defendants filed a timely notice of appeal.

## II. ANALYSIS

### A. Exhaustion of Administrative Remedies

On appeal, defendants first argue that this matter is not ripe for judicial review because plaintiff did not exhaust its administrative remedies. Defendants concede that where there is a notice of assessment regarding funds due the State of Illinois, the Protest Act "potentially" provides an alternate mechanism of review, apart from the administrative process. It is the position of defendants, however, that this case involves, not the assessment of a tax, but the discretion of the Secretary to accept a particular form for filing. Since the Secretary never issued to plaintiff an assessment of funds due, defendants conclude that plaintiff should not be allowed to invoke the

Protest Act as a way to circumvent the Administrative Review Law (735 ILCS 5/3--101 et seq. (West 2004)).

Plaintiff responds that defendants waived their exhaustion claim by expressly representing to the trial court at the hearing on their motion to dismiss that they were not arguing exhaustion of administrative remedies. Waiver aside, plaintiff asserts that this case involves the payment of a disputed tax. According to plaintiff, the Illinois Supreme Court has expressly held that the Protest Act provides an alternative to the Administrative Review Law for seeking judicial review of such matters. Additionally, plaintiff contends that by paying the additional franchise tax under protest, it notified the Secretary that it disputed the payment of the tax, and the Secretary, by filing the form BCA--14.30 plaintiff tendered, determined that plaintiff did in fact owe the tax. Our review is de novo. National City Corp. & Subsidiaries v. Department of Revenue, 366 Ill. App. 3d 37, 39 (2006) (concluding that issues involving statutory interpretation, a ruling on a motion to dismiss, and ripeness are reviewed de novo).

Initially, we address plaintiff's suggestion that defendants waived their exhaustion claim. Defendants' initial argument focuses on exhaustion of administrative remedies. It has been held that "[t]he principles of ripeness and exhaustion of remedies are closely related in that both involve the general issue of the prematurity of the action." Schwanke, Schwanke & Associates v. Martin, 241 Ill. App. 3d 738, 748 (1992). The issue of ripeness is a question of subject matter jurisdiction. See Village of Maywood Board of Fire & Police Commissioners v. Department of Human Rights, 296 Ill. App. 3d 570, 575 (1998). Ergo, the issue of exhaustion of remedies must also present a question of subject matter jurisdiction. See Jagielnik v. Board of Trustees of Police Pension Fund, 211 Ill. App. 3d 26, 32 (1991); see also Gerardi v. City of Bridgeport, 99 Conn. App. 315, 317, 913 A.2d

1076, 1079 (2007) (noting that exhaustion of administrative remedies implicates subject matter jurisdiction), quoting Neiman v. Yale University, 270 Conn. 244, 250, 851 A.2d 1165, 1169 (2004); Blue Cross Blue Shield of Texas v. Duenez, 201 S.W.3d 674, 675 (Tex. 2006); Green v. City of St. Louis, 870 S.W.2d 794, 796 (Mo. 1994). Our supreme court has often held that issues of subject matter jurisdiction may not be waived. Segers v. Industrial Comm'n, 191 Ill. 2d 421, 427 (2000); Currie v. Lao, 148 Ill. 2d 151, 157 (1992); Smith v. Jones, 113 Ill. 2d 126, 130 (1986). Accordingly, we will address this issue.

The Administrative Review Law applies to and governs "every action to review judicially a final decision of any administrative agency where the Act creating or conferring power on such agency, by express reference, adopts the provisions of *** this Act." 735 ILCS 5/3--102 (West 2004). As the aforementioned passage suggests, the Administrative Review Law requires a "final" agency determination before judicial review may commence. Absent a final agency determination, the trial court lacks jurisdiction to consider the matter. Jagielnik, 211 Ill. App. 3d at 32.

The Business Corporation Act adopts the Administrative Review Law. 805 ILCS 5/1.45 (West 2004). However, by its express terms, the scope of section 1.45 is limited to situations in which the Secretary "revoke[s] the certificate of authority to transact business in this State of any foreign corporation" or "fail[s] to approve any articles of incorporation, amendment, merger, consolidation, dissolution, petition for reduction or refund, or any other document required by [the Business Corporation Act] to be approved by the Secretary *** before same shall be filed in his or her office." (Emphasis added.) 805 ILCS 5/1.45 (West 2004); see also Roanoke Agency, Inc. v. Edgar, 101 Ill. 2d 315, 317 (1984); Investors Syndicate of America, Inc. v. Hughes, 378 Ill. 413, 417

(1941).[1] The former situation is not at issue here. In a case in which the Secretary fails to approve a filing, he must, within 10 days of delivery, give written notice of the disapproval, specifying the reasons therefor. 805 ILCS 5/1.45 (West 2004). The Secretary's decision is then subject to judicial review under the Administrative Review Law. 805 ILCS 5/1.45 (West 2004).

In this case, pursuant to an informal practice of the Department, NDC, acting on Neighborhood's behalf, tendered to the Secretary a draft of form BCA--14.30. The draft showed a net decrease in paid-in capital. At that time, Durchholz told NDC that the proposed reduction in paid-in capital did not comply with the Business Corporation Act. Thereafter, a representative of

---

[1] We note that where the legislature has intended all decisions of a governmental entity to be subject to administrative review, it has so stated. See, e.g., 15 ILCS 310/9b (West 2004) ("All final administrative decisions of the Merit Commission shall be subject to judicial review pursuant to the provisions of the Administrative Review Law"); 20 ILCS 415/11a (West 2004) ("All final administrative decisions of the Civil Service Commission hereunder shall be subject to judicial review pursuant to the provisions of the Administrative Review Law"); 20 ILCS 2610/14 (West 2004) ("The provisions of the Administrative Review Law, and all amendments and modifications thereof, and the rules adopted pursuant thereto, shall apply to and govern all proceedings for the judicial review of any order of the Board rendered pursuant to the provisions of this Section"); 225 ILCS 37/120 (West 2004) ("All final administrative decisions of the Department are subject to judicial review under the Administrative Review Law and its rules"); 820 ILCS 125/13 (West 2004) ("All final administrative decisions of the Department hereunder shall be subject to judicial review pursuant to the provisions of the Administrative Review Law, and all amendments and modifications thereof and the rules adopted pursuant thereto").

NDC met with Durchholz to discuss the proposed filing. Durchholz stated that the form would not be approved for filing as long as it showed a reduction in paid-in capital resulting from the merger. NDC then tendered the form with the changes suggested by Durchholz. However, NDC indicated on the face of the form that it was being filed under protest. Attached to the form was a statutory "Notice of Payment Under Protest" and a corresponding check in the amount of $2,152,041, which included a $5 filing fee. In response, Durchholz issued a written statement on the Secretary's letterhead, rejecting the form and the payment. Durchholz explained that the form would not be accepted unless the protest language were removed and the $5 filing fee were omitted from the protested payment. NDC revised the form to comport with Durchholz's request. It then tendered the revised form to the Secretary together with a check for $2,152,041, of which $2,152,036 was paid under protest pursuant to the Protest Act. A stamp bearing the word "filed," the date of May 28, 2004, and the Secretary's name appear on the revised form. In addition, the Secretary accepted the "Notice of Payment Under Protest" and corresponding retendered check. These acts of the Secretary indicate that he "approved" the revised form for filing. See 805 ILCS 5/1.10(e)(3) (West 2004) (requiring the Secretary to find that a document "conforms to law" before filing it). Stated differently, because the Secretary did not "fail to approve" the form tendered by plaintiff, plaintiff was not required to exhaust its administrative remedies before seeking relief in the circuit court.

Our conclusion is supported by the Protest Act (30 ILCS 230/1 et seq. (West 2004)) and the cases interpreting that statute. The Protest Act applies to, among others, the "officers of the Executive Department of the State Government" (30 ILCS 230/1 (West 2004)), including the Secretary (see Ill. Const. 1970, art. V, §1 (listing the Secretary as a member of the executive branch)). See E & E Hauling, Inc. v. Ryan, 306 Ill. App. 3d 131 (1999); Venture Stores, Inc. v.

Ryan, 286 Ill. App. 3d 673 (1997). The Protest Act provides a mechanism for a party to challenge the propriety of money paid to the State of Illinois. To do so, the party must tender the money under protest. 30 ILCS 230/2a, 2a.1 (West 2004). The recipient of funds paid under protest must then notify the Treasurer. 30 ILCS 230/2a (West 2004). The Treasurer then places the money in a special fund known as the "protest fund." 30 ILCS 230/2a (West 2004). At the end of 30 days after payment, the money may be transferred out of the protest fund and deposited into the appropriate fund in which it would have been placed had there been payment without protest, unless the party making the payment under protest has filed a complaint and secured a temporary restraining order or a preliminary injunction restraining the transfer of the money. 30 ILCS 230/2a (West 2004). Once a temporary restraining order or preliminary injunction is issued, the money must remain in the protest fund until the final judgment of the circuit court. 30 ILCS 230/2a (West 2004). In this case, it is undisputed that plaintiff followed the procedure outlined in the Protest Act.

In Chicago & Illinois Midland Ry. Co. v. Department of Revenue, 63 Ill. 2d 474, 478 (1976), the supreme court held that a taxpayer may seek under the Protest Act a judicial determination of the propriety of a disputed tax without first exhausting its administrative remedies. In that case, the Department of Revenue informed the taxpayer that an audit of its books showed a use tax deficiency. The taxpayer paid the tax under protest before it received a formal notice of tax liability. It then sought a temporary injunction and a judicial determination of the dispute, pursuant to the Protest Act. The defendants argued that the Department of Revenue, rather than the circuit court, should determine the disposition of the protested funds because the taxpayer had not exhausted its administrative remedies. The supreme court disagreed, stating that the Protest Act allowed courts "to consider the merits of a claim in those cases where no final administrative decision has been

made" and that the Protest Act gives taxpayers "an alternative to the departmental hearings reviewable under the Administrative Review Act." Chicago & Illinois Midland Ry., 63 Ill. 2d at 482, 484.

Chicago & Illinois Midland Ry. has yet to be overturned. Indeed, its continuing vitality was recently confirmed in National City, 366 Ill. App. 3d 37. At issue in National City was whether the taxpayer was required to exhaust its administrative remedies prior to filing a cause of action under the Protest Act when challenging its income tax liability. National City, 366 Ill. App. 3d at 38. In National City, the Department of Revenue sent the taxpayer a notice of proposed deficiency after auditing its tax return. In a letter accompanying the notice, the Department of Revenue advised the taxpayer that it could pay the deficiency under protest, but that, in any case, it must pay the entire tax and any interest within six days. The taxpayer paid the deficiency under protest and filed a complaint pursuant to the Protest Act, seeking to enjoin the Department of Revenue from transferring from the protest fund the money paid under protest. The Department of Revenue filed a motion to dismiss the complaint. The trial court denied the motion to dismiss and entered a preliminary injunction. The Department of Revenue appealed, arguing that the taxpayer's complaint was not ripe for adjudication because it had not yet issued a final notice of deficiency subject to judicial review.

In addressing the Department of Revenue's argument, the court examined the statutes and regulations governing protested tax liabilities and examined previous decisions interpreting the Protest Act. The court agreed that the Department of Revenue had not issued a final decision subject to administrative review. National City, 366 Ill. App. 3d at 42. Yet, the court pointed out, the taxpayer brought its action pursuant to the Protest Act, not the Administrative Review Law, and the

Protest Act does not, on its face, require the issuance of a final notice of deficiency for a taxpayer to avail itself of the statute's provisions. National City, 366 Ill. App. 3d at 43. Therefore, the court determined that the informal notice of proposed tax liability was sufficient to confer jurisdiction under the Protest Act because the notice alerted the taxpayer of the Department of Revenue's belief that the taxpayer owed taxes on income the taxpayer believed was not taxable. National City, 366 Ill. App. 3d at 46-47.

While neither Chicago & Illinois Midland Ry. nor National City involved the payment of a franchise tax, the courts of this state have adjudicated franchise tax disputes under the Protest Act. For instance, in Venture Stores, Inc., 286 Ill. App. 3d at 676, the taxpayer, who was contesting a payment of the franchise tax, was permitted to proceed under the Protest Act despite the absence of a formal assessment. In that case, the taxpayer reported to the Secretary a reduction in paid-in capital. The taxpayer tendered its franchise tax based on the reduced paid-in capital. The Secretary's office refused to approve the reduction in paid-in capital. As a result, the taxpayer paid under protest the amount required by the Secretary, in accordance with the Protest Act. The matter was resolved by the circuit court even though the Secretary did not issue an assessment. Similarly, in Jewel Tea Co. v. Rowe, 414 Ill. 495, 496-99 (1953), the taxpayer reported a net increase in stated capital and paid-in surplus of $2,500,000. The taxpayer based on the net increase its calculation of the additional franchise tax due. The Secretary refused to accept the taxpayer's report on the basis that the version of the Business Corporation Act then in effect required that a reduction in the amount of stated capital and paid-in surplus be reported separately from an increase in the amount of stated capital and paid-in surplus. As a consequence of the Secretary's interpretation, the taxpayer was required to report a net increase in stated capital and paid-in surplus of $7,500,000. The taxpayer

tendered, under protest, a check to the Secretary for additional franchise tax based on the increase of $7,500,000. The taxpayer then filed suit in the circuit court "to restrain payment into the State treasury and to secure a refund of the disputed amount." Jewel Tea Co., 414 Ill. at 496. Likewise, courts in several other cases, including the following, have permitted the taxpayer to adjudicate a franchise tax dispute under the Protest Act: (1) Illinois Bell Telephone Co. v. Powell, 48 Ill. 2d 375 (1971); (2) United States Borax & Chemical Corp. v. Carpentier, 14 Ill. 2d 111 (1958); (3) E & E Hauling, 306 Ill. App. 3d 131; (4) Caterpillar Finance Corp. v. Ryan, 266 Ill. App. 3d 312 (1994); (5) Allstate Enterprises Stock Fund, Inc. v. Lewis, 36 Ill. App. 3d 154 (1976); and (6) Yellow Equipment & Terminals, Inc. v. Lewis, 35 Ill. App. 3d 875 (1976).

Defendants attempt to distinguish all of the aforementioned cases. Defendants first point out that none of the cases reviewing franchise tax matters under the Protest Act addressed a "ripeness" argument. Thus, defendants reason that those decisions cannot speak to the matters raised in this appeal. However, an appellate court has an independent duty to insure that jurisdiction is proper regardless of whether either party has raised the issue on appeal. See People v. Aldama, 366 Ill. App. 3d 724, 725 (2006); National City, 366 Ill. App. 3d at 46. The fact that none of these courts discussed the jurisdictional issue does not mean that they did not sua sponte determine that jurisdiction was proper.

Defendants also note that both Chicago & Illinois Midland Ry. and National City involved the payment of use and income taxes to the Department of Revenue, not the payment of a franchise tax to the Secretary. Relying principally upon Libby, McNeill & Libby v. Stratton, 359 Ill. 398, 401 (1935), defendants posit that this difference is significant because, unlike the Department of Revenue, the Secretary does not have the authority to assess and levy taxes and the Secretary's duties

with respect to the collection of franchise taxes are merely ministerial. We find defendants' reliance on Libby misplaced. In Libby, the taxpayer challenged the imposition of a franchise tax, under an earlier version of the Protest Act. In addressing the issue, the supreme court did state that a franchise tax is "regarded as being imposed directly by the legislature and an assessment is neither necessary nor possible" and that the duties of the Secretary in collecting such tax were "purely ministerial." Libby, 359 Ill. at 401. Despite these findings, the supreme court allowed the taxpayer to challenge the imposition of the franchise tax, concluding that the Protest Act "authorize[d]" the proceeding. Libby, 359 Ill. at 399. The court explained that the matter was before it due to a "difference of opinion as to the proper interpretation of the applicable law" and that absent this dispute the taxpayer "would have paid the tax upon figures submitted by itself." Libby, 359 Ill. at 401. The court added that "[w]hen that difference arose, the [taxpayer] chose to take advantage of the act of the legislature intended for its benefit. It paid the entire amount and pursued the equitable remedy, thus risking no penalties and being assured of a judicial determination of its contentions." Libby, 359 Ill. at 401. The same can be said in this case. Plaintiff paid the tax under protest and pursued relief under the Protest Act. Thus, contrary to defendant's argument, Libby actually supports plaintiff's use of the Protest Act in this case.

Defendants add that because the funds in dispute relate to a ministerial function of the Secretary, "the only option under the Protest Act is to hold those funds until the ministerial issues are resolved in the proper administrative context. Then, and only then, can the action under the Protest Act be resolved." A similar argument was rejected by our supreme court in Chicago & Illinois Midland Ry. As noted previously, in that case, the supreme court permitted the taxpayer to seek under the Protest Act a judicial determination of the propriety of a disputed tax without first

exhausting its administrative remedies. Chicago & Illinois Midland Ry., 63 Ill. 2d at 478. In so holding, the court acknowledged that allowing a willing taxpayer to pay under protest and avoid the applicable administrative procedures was "to some degree inconsistent with the spirit of the Administrative Review Act." Chicago & Illinois Midland Ry., 63 Ill. 2d at 483-84. However, the court pointed out that the legislature had repealed an amendment to the Protest Act, which had limited the scope of the statute to enjoining transfer of protested funds into the state treasury while requiring the merits of the case to be decided through an administrative hearing process. Chicago & Illinois Midland Ry., 63 Ill. 2d at 481-84. According to the court, the legislature's action evinced its intent "to provide, for the taxpayer willing to pay his taxes under protest, an alternative to the departmental hearings reviewable under the Administrative Review Act." Chicago & Illinois Midland Ry., 63 Ill. 2d at 484. Where a statute has been judicially construed and the legislature does not thereafter amend the statute, it will be presumed that the court's interpretation of the statute was consistent with the legislature's intent. Wakulich v. Mraz, 203 Ill. 2d 223, 233 (2003); Carrera v. Smith, 305 Ill. App. 3d 1079, 1082 (1999). Chicago & Illinois Midland Ry. was decided more than 30 years ago, and the legislature has yet to substantively alter the language of the Protest Act interpreted by the supreme court therein. The legislature's failure to act evinces its tacit assent to our supreme court's interpretation.[2]

---

[2] That the legislature intended the Protest Act to apply to the franchise tax is further illustrated by an examination of section 2a.1 of the Protest Act itself (30 ILCS 230/2a.1 (West 2004)). Section 2a.1 sets forth the form for providing notice of payment under protest. The sample form included in that section expressly references the franchise tax. 30 ILCS 230/2a.1 (West 2004).

Defendants next assert that the Protest Act may not be used where there is no notice of "assessment" regarding money due to the State of Illinois, because application of the Protest Act is limited to " 'questions which must be decided *** in determining the proper disposition' " of money paid under protest. ChiCorp, Inc. v. Bower, 336 Ill. App. 3d 132, 137 (2002), quoting 30 ILCS 230/2a (West 2004). Initially, we question whether an "assessment" is necessary to invoke the Protest Act. In Wexler v. Wirtz Corp., 211 Ill. 2d 18, 25 (2004), the supreme court stated that the Protest Act "allows taxpayers to recover voluntary tax payments if certain procedures are followed." (Emphasis added.) Thus, defendants' insistence on an assessment is dubious. In any event, this case does involve the proper disposition of money. As defendants admit elsewhere in their brief, "[i]nherent in filing form 14.30 is the obligation to pay the tax." See 805 ILCS 5/1.10(e)(3) (West 2004). In this case, plaintiff paid the additional franchise tax under protest. Plaintiff then followed the procedure required by the Protest Act. It filed suit questioning its liability for the tax. Thus, this case does involve a determination regarding the proper disposition of money paid under protest. In particular, the parties dispute whether, under the facts of this case, section 14.30 of the Business Corporation Act allows plaintiff to net cumulative changes in paid-in capital.

Defendants also direct us to National Marine, Inc. v. Illinois Environmental Protection Agency, 159 Ill. 2d 381 (1994). According to defendants, the situation in this appeal is "analogous" to the facts in National Marine, in which the supreme court found the plaintiff's claim not ripe for judicial review. In National Marine, the Illinois Environmental Protection Agency (IEPA) issued a notice informing the plaintiff that it was potentially liable for a " 'release or a substantial threat of a release of a hazardous substance or pesticide.' " National Marine, 159 Ill. 2d at 383. In response, the plaintiff brought suit against the IEPA, seeking declaratory and injunctive relief and the issuance

of a writ of certiorari. The IEPA moved to dismiss the plaintiff's complaint. The trial court granted the IEPA's motion to dismiss, on the grounds that the plaintiff's cause of action was premature and the plaintiff failed to exhaust the administrative remedies available to it under the Environmental Protection Act. A majority of the appellate court found that the trial court erred in dismissing the plaintiff's common-law claim for a writ of certiorari. See National Marine, Inc. v. Environmental Protection Agency, 232 Ill. App. 3d 847, 852 (1992). The supreme court disagreed with the appellate court and affirmed the decision of the trial court. National Marine, 159 Ill. 2d at 393.

The supreme court held that the plaintiff's claim did not constitute a controversy that was ripe for judicial resolution. National Marine, 159 Ill. 2d at 388. The court noted that the IEPA's main functions were investigative and prosecutorial, not adjudicative. National Marine, 159 Ill. 2d at 387. As such, the court found that the notice issued by the IEPA to the plaintiff was "a preliminary notice of potential liability and constitute[d] merely a preliminary step in the [IEPA's] investigation of possible violations of the [Environmental Protection] Act." (Emphasis added.) National Marine, 159 Ill. 2d at 389. Thus, it was not a final agency action ripe for judicial review. The court explained:

"Notifying a party that is subject to an investigation which may potentially lead to the institution of an action against that party does not create a claim capable of judicial resolution. [Citations.] The *** notice neither determines nor adjudicates the liability, rights, duties or obligations of the party subject to it. It merely puts the party 'on notice' that it may be potentially liable under *** the [Environmental Protection] Act and requests that the party take certain response or remedial actions. [Citation.] The party may then undertake the response action requested, may meet and attempt to settle with the [IEPA], or may choose to ignore the notice entirely. [Citation.] Issuance of the *** notice is preliminary to any

final determination of liability by an adjudicative body and neither disposes of the proceedings nor adjudicates legal duties or rights. As such, the issuance of [the] *** notice is an interlocutory action and has no legal effect in and of itself. [Citation.]" National Marine, 159 Ill. 2d at 389.

The court concluded that no "actual controversy" existed because no legal liability was imposed on the plaintiff via the notice issued by the IEPA. National Marine, 159 Ill. 2d at 390. Indeed, the court pointed out that it was entirely possible that the IEPA would not initiate a cost-recovery/enforcement proceeding against the plaintiff. National Marine, 159 Ill. 2d at 390. In addition, the court determined that allowing judicial review of the notice issued to the plaintiff by the IEPA would substantially thwart the legislative purpose of the Environmental Protection Act, which envisions expedient containment of environmental pollution, by delaying the cleanup process. National Marine, 159 Ill. 2d at 392-93.

We do not find National Marine dispositive of the issue presented in this case. Importantly, National Marine does not involve a question regarding the propriety of money paid to the state under the Protest Act. In fact, because no payment was made in that case, the Protest Act could not be invoked. Defendants acknowledge as much, but insist that the court's discussion of the issue of ripeness is instructive and provides valuable guidance. Defendants argue that like the notice from the IEPA in National Marine, the two written letters from the Department in this case neither determined nor adjudicated plaintiff's liability, rights, duties, or obligations. Instead, the letters placed plaintiff "on notice" that the form BCA--14.30 plaintiff tendered would not be accepted for filing in the proposed format. Defendants reason that, as such, the letters were preliminary to any final determination by the Secretary and did not create a matter ripe for judicial determination. The

problem we see with defendants' position is that this case does not involve the rejection of the corporate form tendered by plaintiff. To the contrary, the Secretary accepted the form tendered by plaintiff along with its payment under protest. It is the payment, and more specifically, the parties' interpretation of the statute requiring payment, that is at issue here.

Finally, defendants assert that allowing judicial review of the matter raised in this appeal would undermine the statutory scheme enacted by the legislature whereby the Secretary is charged with overseeing corporate filings, discourage resolution of disputes that can be efficiently addressed by administrative review, and open the floodgates to unnecessary litigation. While we appreciate defendants' concerns, we believe that they are more appropriately addressed to the legislature. In sum, this controversy involves an interpretation of whether the disputed tax was due under the Business Corporation Act. The taxpayer in this case paid the disputed tax under protest. Under such circumstances, our supreme court has permitted a taxpayer to seek under the Protest Act a judicial determination of the propriety of a disputed tax without first exhausting its administrative remedies. Chicago & Illinois Midland Ry., 63 Ill. 2d at 478. Thus, a justiciable controversy of the type contemplated by the Protest Act existed, and the trial court correctly denied defendants' motion to dismiss.

## B. Propriety of Additional Franchise Tax

Having decided that the Protest Act was the proper avenue for plaintiff to challenge the payment of the additional franchise tax, we turn to the principal issue on appeal, i.e., whether the relevant provisions of the Business Corporation Act permit a corporation to net a decrease in paid-in capital resulting from a merger against an increase in paid-in capital resulting from a prior corporate

reorganization for purposes of calculating an additional franchise tax. The trial court ruled in plaintiff's favor, holding that it could net these two transactions. The result of the trial court's finding is that no additional franchise tax was due. Before addressing the parties' relative positions on this matter, we find it helpful to briefly review the relevant provisions of the Business Corporation Act.

Under the Business Corporation Act, "domestic" corporations and "foreign" corporations doing business in Illinois are subject to a franchise tax for the privilege of transacting business in this state. 805 ILCS 5/15.35, 15.65 (West 2004). With certain exceptions not relevant here, the Business Corporation Act defines a foreign corporation as a for-profit corporation organized under laws other than the laws of Illinois. 805 ILCS 5/1.80(b) (West 2004). By this definition, Neighborhood, having been organized under the laws of Delaware, was a foreign corporation.

Foreign corporations are required to pay "initial," "annual," and "additional" franchise taxes. 805 ILCS 5/15.65 (West 2004). The "initial" franchise tax is payable at the time the foreign corporation files its application for authority to transact business in Illinois (805 ILCS 5/15.65(a) (West 2004)) and is based on the corporation's paid-in capital as disclosed by said application (805 ILCS 5/15.70(a) (West 2004)). The "annual" franchise tax is payable each year when the corporation files its annual report (805 ILCS 5/15.65(d) (West 2004)) and is based on the corporation's paid-in capital on the last day of the third month preceding the corporation's "anniversary month" (805 ILCS 5/15.70(d) (West 2004)).[3]

---

[3] With respect to a foreign corporation, the Business Corporation Act defines the date of filing the application for authority to transact business in Illinois as the "anniversary" and the month

Section 14.30 of the Business Corporation Act (805 ILCS 5/14.30 (West 2004)) requires a corporation to file a cumulative report of changes in the number of issued shares or the amount of paid-in capital not otherwise reported. Subsections (a)(1) through (a)(4) of section 14.30 (805 ILCS 5/14.30(a)(1) through (a)(4) (West 2004)) list the various periods for which a report is required. The same section also provides that the report shall net decreases against increases that occur during the "same taxable period." 805 ILCS 5/14.30(c) (West 2004). In relation to the report required under section 14.30, section 15.65(b) of the Business Corporation Act (805 ILCS 5/15.65(b) (West 2004)) requires a foreign corporation to pay a corresponding "additional franchise tax at the time of filing *** a report of cumulative changes in paid-in capital or a report of an exchange or reclassification of shares, whenever any such report discloses an increase in its paid-in capital over the amount thereof last reported in any document, other than an annual report."

It is the payment of the "additional" franchise tax that is at issue in this case. In particular, the parties dispute whether, in the case of a statutory merger, the Business Corporation Act considers the effect of the merger in calculating the additional franchise tax due. In arguing that the Secretary correctly calculated the additional franchise tax, defendants rely principally on section 14.30 of the Business Corporation Act. According to defendants, the decrease in paid-in capital resulting from Neighborhood's merger into NDC did not occur in the "same taxable period" as the increase in paid-in capital attributable to the corporate reorganization, as required by section 14.30(c) (805 ILCS

---

in which the anniversary of the corporation occurs as the "anniversary month." 805 ILCS 5/1.80(n)(2), (o) (West 2004).

5/14.30(c) (West 2004)). Defendants contend that the "same taxable period" referenced in section 14.30(c) refers to the time frames set forth in subsections (a)(1) through (a)(4) of section 14.30 (805 ILCS 5/14.30(a)(1) through (a)(4) (West 2004)). Relevant here, defendants argue that subsection (a)(3) (805 ILCS 5/14.30(a)(3) (West 2004)) is applicable to this case. Defendants interpret subsection (a)(3) (805 ILCS 5/14.30(a)(3) (West 2004)) as requiring the calculation of the additional franchise tax based on the increase in Neighborhood's paid-in capital from the date of its last annual report up to, but not including, the effect of the merger. Applying this interpretation to the case at hand, defendants calculate that Neighborhood accrued a positive change in its paid-in capital as a result of the corporate reorganization, resulting in additional franchise tax due.

Plaintiff responds that the phrase "taxable period" referenced in section 14.30(c) is defined in section 1.80(w) of the Business Corporation Act (805 ILCS 5/1.80(w) (West 2004)) as the "12-month period commencing with the first day of the second month preceding the corporation's anniversary month in the preceding year and prior to the first day of the second month immediately preceding its anniversary month in the current year." Plaintiff urges that under this definition, subsection (a)(3) of section 14.30 requires the effect of a merger to be included in determining any change in issued shares or paid-in capital for the purpose of calculating the additional franchise tax due. In this case, therefore, the merger offset any increase in paid-in capital attributable to the corporate reorganization. Plaintiff concludes that since Neighborhood did not experience a net increase in its paid-in capital as a result of these transactions, no additional franchise tax could be legally imposed.

The standard of review from an order granting summary judgment is de novo. Blair v. Nevada Landing Partnership, 369 Ill. App. 3d 318, 322 (2006). In addition, the principal issues we are asked to resolve involve matters of statutory construction. We review issues of statutory construction de novo. E & E Hauling, 306 Ill. App. 3d at 136. The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. MD Electrical Contractors, Inc. v. Abrams, 369 Ill. App. 3d 309, 312 (2006). As a general rule, the statutory language is the best evidence of the legislature's intent, and such language should be given its plain and ordinary meaning. Travelers Casualty & Surety Co. v. A.G. Carlson, Inc., 368 Ill. App. 3d 519, 526 (2006). In interpreting a statute, we must construe words and phrases in light of other relevant portions of the statute so that, if possible, no term is rendered superfluous or meaningless. West Suburban Bank v. City of West Chicago, 366 Ill. App. 3d 1137, 1140 (2006). Moreover, "[a] court is not permitted to ignore the plain meaning of the statute by reading into it exceptions, limitations, or conditions that the legislature did not express." Forest Preserve District of Du Page County v. Loren & Gisela Brown Family Trust, 323 Ill. App. 3d 686, 692 (2001). "Only where the language of the statute is ambiguous may the court resort to other aids of statutory construction." People v. Glisson, 202 Ill. 2d 499, 505 (2002). "A statute is ambiguous if it is capable of two reasonable and conflicting interpretations." Paciga v. Property Tax Appeal Board, 322 Ill. App. 3d 157, 161 (2001).

Our analysis focuses on section 14.30 of the Business Corporation Act (805 ILCS 5/14.30 (West 2004)). That provision provides in relevant part:

"§14.30. Cumulative report of changes in issued shares or paid-in capital.

(a) Each domestic corporation and each foreign corporation authorized to transact business in this State that effects any change in the number of issued shares or the amount of paid-in capital that has not theretofore been reported in any report other than an annual report, interim annual report, or final transition annual report, shall execute and file, in accordance with Section 1.10 of this Act, a report with respect to the changes in its issued shares or paid-in capital:

(1) that have occurred subsequent to the last day of the third month preceding its anniversary month in the preceding year and prior to the first day of the second month immediately preceding its anniversary month in the current year; or

(2) in the case of a corporation that has established an extended filing month, that have occurred during its fiscal year; or

(3) in the case of a statutory merger or consolidation or an amendment to the corporation's articles of incorporation that affects the number of issued shares or the amount of paid-in capital, that have occurred between the last day of the third month immediately preceding its anniversary month and the date of the merger, consolidation, or amendment or, in the case of a corporation that has established an extended filing month, that have occurred between the first day of its fiscal year and the date of the merger, consolidation, or amendment; or

(4) in the case of a statutory merger or consolidation or an amendment to the corporation's articles of incorporation that affects the number of issued shares or the

amount of paid-in capital, that have occurred between the date of the merger, consolidation, or amendment (but not including the merger, consolidation, or amendment) and the first day of the second month immediately preceding its anniversary month in the current year, or in the case of a corporation that has established an extended filing month, that have occurred between the date of the merger, consolidation, or amendment (but not including the merger, consolidation or amendment) and the last day of its fiscal year.

***

(c) The report shall net decreases against increases that occur during the same taxable period."  805 ILCS 5/14.30 (West 2004).

The trial court held that application of subsection (a)(3) of section 14.30 (805 ILCS 5/14.30(a)(3) (West 2004)) required the report to account for a reduction in paid-in capital on the "merger date." In support of this finding, the court noted that the parenthetical in subsection (a)(4) of section 14.30 (805 ILCS 5/14.30(a)(4) (West 2004)) specifically excludes the merger in calculating the additional franchise tax.  The court reasoned, therefore, that if the legislature had also intended to exclude the effect of the merger in computing the additional franchise tax under subsection (a)(3), it would have explicitly said so.

The parties first direct our attention to subsection (c) of section 14.30, questioning what the legislature meant when it drafted that provision to read that the cumulative report of changes in issued shares or paid-in capital "shall net decreases against increases that occur during the same taxable period." (Emphasis added.)  805 ILCS 5/14.30(c) (West 2004).  Defendants acknowledge

that the phrase "taxable period" is defined in section 1.80(w) of the Business Corporation Act (805 ILCS 5/1.80(w) (West 2004)), as plaintiff notes.[4]  However, defendants argue that that definition does not apply to the phrase as it is used in section 14.30(c).  Defendants point out that with respect to section 14.30(c), the phrase "taxable period" does not stand alone.  Rather, it is modified by the word "same."  Defendants reason that by modifying the phrase "taxable period" in this manner, the legislature must have intended some meaning distinct from the definition given to the phrase in section 1.80(w).  In support of this position, defendants note that where the legislature intended to use the term "taxable period" as defined in section 1.80(w), it did so without modifying the phrase.[5]

---

[4]  Relevant here, section 1.80(w) defines the phrase "taxable period" as the "12-month period commencing with the first day of the second month preceding the corporation's anniversary month in the preceding year and prior to the first day of the second month immediately preceding its anniversary month in the current year." 805 ILCS 5/1.80(w) (West 2004).  The same provision states that for a corporation that has established an extended filing month, "taxable period" means the "12-month period ending with the last day of its fiscal year immediately preceding the extended filing month." 805 ILCS 5/1.80(w) (West 2004).  Neighborhood has not established an extended filing month, and its "anniversary month" is June.  Thus, Neighborhood's "taxable period" is from April 1 of a given year through March 31 of the subsequent year.

[5]  The statutory references that defendants provide for this position refer to "taxable year," not "taxable period."  See 805 ILCS 5/9.05(e), 14.01(a), 14.25(d), 14.30(f) (West 2004).  The Business Corporation Act distinguishes these two phrases.  Compare 805 ILCS 5/1.80(q) (West

Plaintiff simply responds that the definition of "taxable period" in section 1.80(w) applies to section 14.30(c).

Examining the plain language of subsection (c) of section 14.30 of the Business Corporation Act (805 ILCS 5/14.30(c) (West 2004)), we agree with plaintiff that the phrase "taxable period" in section 14.30(c) has a meaning consistent with the definition of that phrase in subsection (w) of section 1.80 of the Business Corporation Act (805 ILCS 5/1.80(w) (West 2004)). Section 14.30(c) requires the report to "net decreases against increases that occur during the same taxable period." The word "same" has been defined to mean "[t]he very thing mentioned or described." Black's Law Dictionary 1341 (7th ed. 1999). Contrary to defendants' argument, the modifier "same" does not refer to the time frames referenced in subsections (a)(1) through (a)(4) of section 14.30 of the Business Corporation Act (805 ILCS 5/14.30(a)(1) through (a)(4) (West 2004)). Rather, it refers to the taxable period during which the decrease occurred and the taxable period during which the increase occurred. To net a decrease against an increase, both of these events must occur within the "same" "taxable period," i.e., the "taxable period" defined by section 1.80(w) of the Business Corporation Act.

---

2004) (defining "taxable year") with 805 ILCS 5/1.80(w) (West 2004) (defining "taxable period"). Nevertheless, our research has revealed at least two subsections of the Business Corporation Act in which the phrase "taxable period" is used without modification. See 805 ILCS 5/15.40(f), 15.70(f) (West 2004).

Moreover, to the extent that the phrase "taxable period" is capable of two reasonable and conflicting interpretations, a brief examination of the legislative history of the statutory provisions relevant to our analysis resolves any ambiguity. The definition of "taxable period" contained in section 1.80(w) of the Business Corporation Act (805 ILCS 5/1.80(w) (West 2004)) was added by Public Act 87--516 (Pub. Act 87--516, eff. September 13, 1991 (amending Ill. Rev. Stat. 1989, ch. 32, par. 1.80)). Prior to the enactment of Public Act 87--516, section 14.30 of the Business Corporation Act required the cumulative report to net "decreases against increases, which occur during the <u>same taxable year</u>." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 32, par. 14.30(a). However, the phrase "taxable period" was substituted for the term "taxable year" by Public Act 87--516. See Pub. Act 87--516, eff. September 13, 1991 (amending Ill. Rev. Stat. 1989, ch. 32, par. 14.30); 805 ILCS 5/14.30(c) (West 2004). In other words, the legislature substituted the phrase "taxable period" in section 14.30 for the phrase "taxable year" with the same public act that added the definition for the phrase "taxable period" to the Business Corporation Act. These actions dispel any notion that the legislature intended the term "taxable period" to have any meaning other than the one ascribed to it by section 1.80(w) of the Business Corporation Act.

Despite our conclusion, we agree with defendants that the increase in paid-in capital as a result of Neighborhood's corporate reorganization did not occur during the "same" "taxable period" as the decrease in paid-in capital attributable to the merger. Indeed, we find that neither of the foregoing changes in Neighborhood's paid-in capital occurred during any "taxable period" as that phrase is defined in section 1.80(w) of the Business Corporation Act. Rather, as we discuss more

thoroughly below, each change occurred during a separate reportable period as defined in the various provisions of the Business Corporation Act.

As noted above, subsection (a) of section 14.30 provides in relevant part that "[e]ach *** foreign corporation authorized to transact business in this State that effects any change in the number of issued shares or the amount of paid-in capital that has not theretofore been reported *** shall execute and file *** a report with respect to the changes in its issued shares or paid-in capital." 805 ILCS 5/14.30(a) (West 2004). The statute then lists four separate events that trigger the filing of a report. Subsection (a)(1) requires a report for changes that have occurred "subsequent to the last day of the third month preceding [the corporation's] anniversary month in the preceding year and prior to the first day of the second month immediately preceding [the corporation's] anniversary month in the current year." 805 ILCS 5/14.30(a)(1) (West 2004). While the language of subsection (a)(1) is not identical to the language defining the phrase "taxable period" in section 1.80(w) (805 ILCS 5/1.80(w) (West 2004)), the time period these two provisions describe is the same. With respect to a corporation that has established an extended filing month, subsection (a)(2) requires a report for changes that have occurred "during its fiscal year." 805 ILCS 5/14.30(a)(2) (West 2004). Again, this time period corresponds with the time period outlined in section 1.80(w) for a corporation opting to establish an extended filing month. Because changes pursuant to subsections (a)(1) and (a)(2) occur during a "taxable period" as defined by the legislature in section 1.80(w) of the Business Corporation Act, any report filed pursuant to subsection (a)(1) or (a)(2) may net decreases against increases that occur during the "same taxable period." 805 ILCS 5/14.30(c) (West 2004).

Subsections (a)(3) and (a)(4) both apply to a corporation undergoing a statutory merger. Subsection (a)(3) requires a report for changes that have occurred "between the last day of the third month immediately preceding its anniversary month and the date of the merger." 805 ILCS 5/14.30(a)(3) (West 2004). Subsection (a)(4) requires a report for changes that have occurred "between the date of the merger *** (but not including the merger ***) and the first day of the second month immediately preceding [the corporation's] anniversary month in the current year." 805 ILCS 5/14.30(a)(4) (West 2004). Neither of the reporting periods set forth in subsection (a)(3) or (a)(4) constitutes an entire "taxable period" as that phrase is defined in section 1.80(w) of the Business Corporation Act. As a result, we hold that neither a corporation filing a report in accordance with subsection (a)(3) nor a corporation filing a report in accordance with subsection (a)(4) may net decreases against increases as a result of a statutory merger. Applying the foregoing analysis to this case, we conclude that the merger of Neighborhood into NDC did not effect a reportable decrease in Neighborhood's paid-in capital for purposes of calculating the additional franchise tax due as a result of the cumulative change in issued shares or paid-in capital.

Plaintiff claims that such an interpretation means that decreases in paid-in capital resulting from a statutory merger can never be reported. We disagree. Our decision says nothing about whether such decreases may be <u>reported</u>. Rather, our holding is that any decreases in paid-in capital resulting from a statutory merger may not be used to offset increases in paid-in capital for purposes of calculating the additional franchise tax, because such changes do not occur during a "taxable period" as that phrase is defined in section 1.80(w) of the Business Corporation Act (805 ILCS 5/1.80(w) (West 2004)).

In addition, the trial court's and plaintiff's interpretation of section 14.30(a)(3) would frustrate the purpose of the franchise tax. The tax is imposed for the privilege of transacting business in Illinois. 805 ILCS 5/15.35, 15.65 (West 2004). The trial court's and plaintiff's interpretation of subsection (a)(3) would render that provision meaningless, as any net increase in a corporation's paid-in capital from the last day of the third month immediately preceding a corporation's anniversary month up to the effective time of a merger would be eliminated upon merger. In this case, Neighborhood experienced changes in its issued shares and its paid-in capital on October 31, 2003, November 4, 2003, and November 11, 2003. If we were to permit Neighborhood to eliminate its paid-in capital upon the merger, the net increases it experienced during its corporate existence would be left untaxed.

Our conclusion that the legislature did not intend a corporation involved in a statutory merger to net any decreases in issued shares or paid-in capital against any increases in issued shares or paid-in capital is supported by House Bill 5631 (92d Ill. Gen. Assem., House Bill 5631, 2002 Sess.). Although this legislation never became law, it provides insight on the issue at hand. House Bill 5631 sought to amend various provisions of the Business Corporation Act. In particular, the bill sought to add article 15A, entitled "Franchise Tax," to the Business Corporation Act. Relevant here, section 15A.55 would have provided:

> "Sec. 15A.55. Final taxable period. A corporation that dissolves, liquidates, withdraws from this State, or has its corporate existence terminated in a merger or consolidation shall not be obligated to pay any franchise tax for the period existing from the

end of its immediately preceding taxable period to the date of the liquidation, dissolution, withdrawal, or termination." 92 Ill. Gen. Assem., House Bill 5631, 2002 Sess.

The same bill sought to amend section 14.30 of the Business Corporation Act by adding subsection (g). Subsection (g) would have provided that section 14.30 "shall not apply to any franchise tax due for any taxable period ending on or after December 31, 2002 to which Article 15A applies." 92 Ill. Gen. Assem., House Bill 5631, 2002 Sess.

It is well settled that when a statute is amended, it is presumed that the legislature meant to change the law as it formerly existed. Board of Trustees of Southern Illinois University v. Department of Human Rights, 159 Ill. 2d 206, 213 (1994); Puleo v. Topel, 368 Ill. App. 3d 63, 67 (2006); In re Marriage of Schmitt, 321 Ill. App. 3d 360, 366 (2001). Although House Bill 5631 never became law, we view the proposed section 15A.55 of the Business Corporation Act as an attempt by the legislature to change existing law regarding whether a corporation involved in a statutory merger is required to pay additional franchise tax between the end of its previous taxable period and the date of the merger. See People v. Holloway, 177 Ill. 2d 1, 11 (1997) (noting that legislature's attempt to amend law could be viewed as an attempt to change existing law). In conclusion, because neither the increase in Neighborhood's paid-in capital as a result of its corporate reorganization nor the decrease in Neighborhood's paid-in capital as a result of its merger into NDC occurred during a "taxable period" as defined in section 1.80(w) of the Business Corporation Act, these two changes may not be netted under section 14.30(c) for the purpose of calculating the additional franchise tax.

3. Obligation of NDC to Pay Franchise Tax

Plaintiff argues that the application of section 14.30 to NDC constitutes the unlawful imposition of a tax on a limited liability company. Plaintiff asserts that the Business Corporation Act imposes franchise taxes only on corporations and that there is no provision under the Business Corporation Act that permits the imposition of a tax on a limited liability company, such as NDC. We are unpersuaded by plaintiff's argument. Both Neighborhood and NDC were organized under the laws of Delaware. Delaware law provides for the merger of a domestic corporation into a domestic limited liability company. Del. Code Ann. tit. 8, §264(a) (West 2004) ("Any 1 or more corporations of this State may merge or consolidate with 1 or more limited liability companies, of this State"); see also Del. Code Ann. tit. 6, §18--209(b) (West 2004). With respect to such mergers, Delaware law provides that "all debts, liabilities and duties of each of the said domestic limited liability companies and other business entities that have merged or consolidated shall thenceforth attach to the surviving or resulting domestic limited liability company or other business entity, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it." Del. Code Ann. tit. 6, §18--209(g) (West 2004); see also Del. Code Ann. tit. 8, §259(a) (West 2004). In this case, therefore, NDC, as the surviving domestic limited liability company, is responsible for the additional franchise tax due as a result of the increase in Neighborhood's paid-in capital prior to the merger.

Anticipating such a finding, plaintiff counters that "there was no outstanding tax obligation due at the time of the merger, and thus no liability from which to succeed." In support of its position, plaintiff posits the following. Section 15.65(b) of the Business Corporation Act (805 ILCS 5/15.65(b) (West 2004)) "imposes an additional franchise tax on corporations 'at the time of filing

*** a report of cumulative changes in paid-in capital *** whenever any such report discloses an increase in its paid-in capital over the amount thereof last reported.' " (Emphasis in original.) Further, section 14.30(b) (805 ILCS 5/14.30(b) (West 2004)) provides in relevant part that the corporation shall file the cumulative report of changes in issued shares or paid-in capital, "not later than the time of filing *** the certified copy of merger of a foreign corporation." The filing of the certified copy of merger in Illinois can take place only after the merger has been completed in the foreign jurisdiction and a certified copy of merger is obtained. Neighborhood ceased to exist under Delaware law at the effective time of the merger (Del. Code Ann. tit. 8, §259(a) (West 2004)). Since form BCA--14.30 was not due to be filed until after Neighborhood ceased to exist, no liability could be imposed under section 15.65(b). Plaintiff adds that although this process normally poses no problem because the surviving entity is usually another corporation, in this instance, NDC, a limited liability company, was the only entity in existence at the only time the tax could be imposed. We disagree with plaintiff's analysis.

Initially, we point out that plaintiff's reliance on Delaware law for the proposition that for the purposes of Illinois law Neighborhood ceased to exist at the effective time of the merger is misplaced. With respect to the merger of a Delaware corporation into a Delaware limited liability company, Delaware law provides in relevant part that "[w]hen any merger or consolidation shall have become effective under this chapter, for all purposes of the laws of this State the separate existence of all the constituent corporations *** shall cease." (Emphasis added.) Del. Code Ann. tit. 8, §259(a) (West 2004). Thus, the non-surviving corporation in a merger under Delaware law ceases to exist for the purposes of the laws of Delaware only. Relevant here, in Illinois a merger

-34-

involving a corporation becomes effective only "upon filing of the articles of merger, consolidation or exchange by the Secretary of State." 805 ILCS 5/11.40 (West 2004). In this case, the Secretary refused to file the certificate of merger until after plaintiff submitted form BCA--14.30. Therefore, plaintiff's argument that no liability could be imposed under section 15.65(b) because form BCA--14.30 was not due to be filed until <u>after</u> Neighborhood ceased to exist is flawed.

Relying on section 15.65(b) of the Business Corporation Act (805 ILCS 5/15.65(b) (West 2004)), plaintiff continues that "[i]t is no defense to assert that the activities by which the tax is measured occurred while Neighborhood was in existence. The General Assembly chose to defer actual imposition of the tax until a later time." We reject this argument. Despite plaintiff's suggestion to the contrary, section 15.65(b) does not dictate when the tax is "imposed." Rather, that provision indicates when the tax must be <u>paid</u>. The tax accrues when a change in paid-in capital occurs. Under the factual scenario in this case, Neighborhood experienced several increases in paid-in capital during the relevant reporting period. When these changes in paid-in capital occurred, the additional franchise tax accrued. However, the tax did not become payable until the certified copy of merger was filed with the Secretary. 805 ILCS 5/14.30(b), 15.65(b)(3) (West 2004).

### 4. Constitutionality Challenge

Plaintiff also complains that the Secretary's construction of section 14.30 of the Business Corporation Act (805 ILCS 5/14.30 (West 2004)) in the present case violates the uniformity clause of the Illinois Constitution (Ill. Const. 1970, art. IX, §2) and the equal protection clauses of the federal and state constitutions (U.S. Const., amend. IV; Ill. Const. 1970, art. I, §2). The uniformity clause provides that "[i]n any law classifying the subjects or objects of non-property taxes or fees,

the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall be reasonable." Ill. Const. 1970, art. IX, §2. Our supreme court has stated that if a tax is constitutional under the uniformity clause, it "inherently fulfills the requirements of *** equal protection." Geja's Cafe v. Metropolitan Pier & Exposition Authority, 153 Ill. 2d 239, 247 (1992). As such, we confine our discussion to whether the Secretary's interpretation of section 14.30 of the Business Corporation Act violates the uniformity clause of the Illinois Constitution.

With respect to a challenge under the uniformity clause, our supreme court recently stated:

"To survive scrutiny under the uniformity clause, a nonproperty tax classification must (1) be based on a real and substantial difference between the people taxed and those not taxed, and (2) bear some reasonable relationship to the object of the legislation or to public policy. [Citation.] The uniformity clause was intended to be a broader limitation on legislative power to classify for nonproperty tax purposes than the limitation of the equal protection clause [citation] and was meant to insure that taxpayers would receive added protection in the state constitution based upon a standard of reasonableness that is more rigorous than that contained in the federal constitution [citation]. The party attacking a tax classification is not required to negate every conceivable basis that might support it. [Citation.] When faced with a good-faith uniformity challenge, the taxing body bears the initial burden of producing a justification for the classification. The challenging party then has the burden of persuading the court that the taxing body's explanation is insufficient as a matter of law or unsupported by the facts. [Citations.] Despite the more stringent standard

under the uniformity clause, the scope of a court's inquiry is 'relatively narrow.' [Citation.]
'[I]n a uniformity clause challenge the court is not required to have proof of perfect
rationality as to each and every taxpayer. The uniformity clause was not designed as a
straitjacket for the General Assembly. Rather, the uniformity clause was designed to enforce
minimum standards of reasonableness and fairness as between groups of taxpayers.'
[Citation.]" Arangold Corp. v. Zehnder, 204 Ill. 2d 142, 153 (2003).

Applying the foregoing principles to this case, we are unpersuaded by plaintiff's uniformity clause
challenge.

Plaintiff contends that under the Secretary's construction of section 14.30 of the Business
Corporation Act, a corporation that experiences a reduction in paid-in capital resulting from a
statutory merger is not permitted to use such a reduction to offset any increases in paid-in capital
occurring during the same taxable period, but a corporation not involved in a statutory merger may
net decreases in paid-in capital against increases in paid-in capital occurring during the same taxable
period. Plaintiff insists, however, that for purposes of the franchise tax there is no difference
between the two classifications. We disagree, as the two classes plaintiff compares are the
proverbial apples and oranges. As discussed above, a corporation involved in a statutory merger
does not have an entire taxable period in which to offset increases in paid-in capital with decreases
in paid-in capital. Yet, the tax is assessed uniformly as to this class. See Grenier & Co. v.
Stevenson, 42 Ill. 2d 289, 291 (1969) ("The only rule of uniformity required with respect to taxes
on franchises is that they shall be uniform upon the class on which they operate"). Thus, plaintiff's
attempt to compare the additional franchise tax imposed upon a corporation involved in a statutory

merger with the additional franchise tax assessed upon a corporation that experiences a change in paid-in capital during an entire taxable period is unavailing.

In addition, we find that payment of the additional franchise tax in a case of a statutory merger bears some reasonable relationship to the object of the legislation. Defendants assert that the purpose of the additional franchise tax is to tax changes in a corporation's paid-in capital during a period of time when the corporation enjoyed the fruits of transacting business in Illinois. See 805 ILCS 5/15.65 (West 2004) ("For the privilege of exercising its authority to transact business in this State *** each foreign corporation shall pay to the Secretary of State the following franchise taxes"); see also 805 ILCS 5/15.35 (West 2004) (requiring payment of franchise taxes by domestic corporations). We agree. As we explained earlier, if we were to adopt plaintiff's position, an increase in a corporation's paid-in capital would be left untaxed.

### III. CONCLUSION

For the aforementioned reasons, we conclude that the Protest Act was the proper mechanism to challenge the imposition of the additional franchise tax at issue in this dispute. Therefore, we affirm that portion of the trial court's decision allowing NDC's claim to proceed under that statute. However, we find that the trial court erred in concluding that section 14.30 of the Business Corporation Act did not require the Secretary to collect the additional franchise tax under the facts of this case. Accordingly, we reverse the judgment of the circuit court of Du Page County granting plaintiff's motion for summary judgment. We remand this cause for entry of an order granting summary judgment in defendants' favor.

Affirmed in part and reversed in part; cause remanded with directions.

HUTCHINSON and CALLUM, JJ., concur.