# Illinois Official Reports

## Appellate Court

---

### *In re Jose A.*, 2018 IL App (2d) 180170

---

| | |
|---|---|
| Appellate Court Caption | *In re* JOSE A., a Minor (The People of the State of Illinois, Petitioner-Appellant, v. Jose A., Respondent-Appellee). |
| District & No. | Second District<br>Docket No. 2-18-0170 |
| Filed | October 18, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 17-JD-281; the Hon. Christopher B. Morozin, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded. |
| Counsel on Appeal | Michael G. Nerheim, State's Attorney, of Waukegan (Patrick Delfino, David J. Robinson, and Ivan O. Taylor Jr., of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>James E. Chadd, Thomas A. Lilien, and Sherry R. Silvern, of State Appellate Defender's Office, of Elgin, for appellee. |
| Panel | PRESIDING JUSTICE HUDSON delivered the judgment of the court, with opinion.<br>Justices Schostok and Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1    In a petition for adjudication of wardship, respondent, Jose A., was charged with delivery of a controlled substance (720 ILCS 570/407(b)(5) (West 2016)) and unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2016)). Respondent filed a motion to suppress statements, alleging that at two separate interviews—one at his high school and one at a police station—he was subjected to custodial interrogations in violation of section 5-401.5 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-401.5 (West 2016)). After a hearing, the circuit court of Lake County agreed with respondent and granted his motion to suppress statements. The State filed a certificate of impairment and appealed. For the reasons set forth below, we hold that the trial court properly suppressed the statement respondent made at the police station but erred in suppressing the statement respondent made at the high school. As a result, we affirm in part, reverse in part, and remand this matter for further proceedings.[1]

¶ 2                                      I. BACKGROUND

¶ 3    On April 6, 2017, a teacher at Lake Zurich High School suspected that a student was under the influence of "something." The teacher contacted Tiffany Reagan and Matthew Aiello, deans at the high school, to investigate the situation. Believing that the student was under the influence of alcohol, Deans Reagan and Aiello called Mark Frey, an officer with the Lake Zurich Police Department and the resource officer assigned to the school, to bring a Breathalyzer machine to the school. Officer Frey was unable to assist at that time, so he instructed the deans to call the police department and request another officer for assistance. Ultimately, Deans Reagan and Aiello learned that the student had taken Xanax. The student informed the deans that respondent provided the substance to her in the school library. During the investigation, drugs were seized from other students, some of whom stated that they had obtained the substances from respondent.

¶ 4    When the investigation began, respondent was off the high school's premises to attend classes at the College of Lake County. Deans Reagan and Aiello waited outside the main entrance of the high school for respondent to return. When respondent's bus arrived, Deans Reagan and Aiello "retrieved" respondent and brought him to Aiello's office, where they and Assistant Principal Pikul began questioning him. Respondent was told that he was under investigation for possessing or delivering Xanax. Respondent initially denied the allegations, and a search of respondent's backpack yielded only an empty tin for mints. After the search of respondent's backpack, Dean Reagan and Assistant Principal Pikul continued questioning respondent. Respondent eventually admitted that he had possessed pills and given some to a student. Respondent was not allowed to return to class that day and was suspended for two weeks. At the time of these events, respondent was six days shy of his seventeenth birthday.

¶ 5    After respondent's statement, school personnel waited for Officer Frey so that he could conduct a pat-down search of respondent's person. Officer Frey estimated that he arrived between 45 and 60 minutes after respondent was escorted off the bus. Upon Officer Frey's arrival, Deans Reagan and Aiello informed him of their investigation. Respondent was waiting

---

[1]Given that we ordered supplemental briefing in this case and held oral argument, we have good cause for issuing our decision beyond the 150-day deadline under Illinois Supreme Court Rule 660A(f) (eff. July 1, 2018).

in the student-support center, which Officer Frey described as an "in-school detention room." Officer Frey testified that there is no hallway access to or from the student-support center. To exit the area, an individual must walk through a suite of rooms, including the deans' offices. Respondent's parents and his adult brother were advised of and present for the pat-down. According to Officer Frey, Dean Reagan escorted respondent from the student-support center to her office for the pat-down. According to respondent's mother, Officer Frey escorted respondent. Prior to the pat-down, Officer Frey told respondent that he was going to search him, but he did not ask for his permission. Officer Frey did not find anything on respondent's person, and he did not have a conversation with respondent at that time.

¶ 6      Deans Reagan and Aiello informed Officer Frey that the delivery of the drugs had occurred in the library. Therefore, immediately following the pat-down, Officer Frey went to his office in the school, located in the same suite of rooms as the deans' offices, to search the school's video security system. Officer Frey located a video of the library, showing four individuals sitting at a table "looking around anxiously." Officer Frey testified that the video shows respondent from the back. Respondent is seen "playing with something," looking down, and then handing something across the table to the student involved in the morning incident. Officer Frey admitted that the video was grainy and that he could not see what was being passed, but he claimed that the video corroborated information received from students. Officer Frey estimated that it took him 15 minutes to locate the video.

¶ 7      Officer Frey gave the video to Deans Reagan and Aiello. Officer Frey returned to his office while the deans viewed the video with respondent's parents. Without viewing the video, but having been told that there was a video, respondent corroborated the events depicted in the video. After being advised that the school's investigation was complete, Officer Frey returned to Dean Reagan's office. Officer Frey then informed respondent and his family that respondent would have to come to the police station for booking. Officer Frey told respondent that he would be in contact to arrange a date for those procedures. Officer Frey testified that he wanted to book respondent

> "[b]ecause [respondent] was in possession of a controlled substance and distributed it to—that I had the evidence and probable cause to have to charge him with those crimes. And instead of taking him into custody right then, I allowed him the ability if he wanted to contact a lawyer or anybody else that he would be able to and set up a meeting at a later time."

Officer Frey acknowledged that at no point during his involvement at the high school did he tell respondent or his parents that respondent was free to leave.

¶ 8      Respondent's mother was subsequently contacted by Officer Frey, who requested that she bring respondent to the Lake Zurich Police Department to answer some questions and be fingerprinted. On April 13, 2017, respondent and his mother went to the police station. Officer Frey met respondent and his mother in the lobby of the police station and, at the request of respondent's mother, called for a translator. It took approximately 25 minutes for a police officer from the Kildeer Police Department to arrive to translate. Once the translating officer arrived, Officer Frey escorted respondent, respondent's mother, and the translating officer to an interview room adjacent to the lobby.

¶ 9      Officer Frey described the interview room as follows:

> "It was [*sic*] an unlocked door. It is accessible to the public. It is not in the secured area by any means. The door was unlocked. I had to unlock it to get in, but then it was

left unlocked while we were in there. There is fingerprint equipment out for other purposes in the police department, and there is a table with four chairs. So it is sort of as [*sic*] an area where we can talk with somebody that's kind of secluded from obviously the public lobby area."

Officer Frey added that the room is typically used when someone comes to the police station to make a report or for "private conversation" between a police officer and a member of the public. Officer Frey said that he also uses the room to interview suspects before taking them into custody.

¶ 10    Officer Frey explained that respondent was at the police station so that he could be "booked and processed for the charges of possession of a controlled substance and the distribution of [a] controlled substance." During the interview, Officer Frey was dressed in plainclothes, the same way he dresses while on duty at the high school. In addition, Officer Frey was armed with his duty pistol and carrying handcuffs. In the interview room, Officer Frey read respondent the juvenile *Miranda* form (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and then questioned him for 15 minutes regarding the incident at the school.[2] Officer Frey testified that he was aware of a new statutory recording requirement, effective in 2017 (see 705 ILCS 405/5-401.5(b) (West 2016)), but that he did not record the interview because he did not consider respondent to be in custody. Officer Frey admitted nevertheless that he was seeking incriminating information from respondent. After the interview concluded, Officer Frey took respondent to the station's secure area to be booked and fingerprinted. Respondent was permitted to leave the station with his mother after further juvenile court procedures were explained to him. Officer Frey estimated that respondent was at the station for a total of 50 to 55 minutes.

¶ 11    After hearing the evidence, the trial court noted that it had considered People's exhibit No. 1 (the juvenile *Miranda* form) and respondent's exhibit No. 1 (the library security video) as well as the witness testimony. The court first addressed the statement made at the high school. The court noted that section 5-401.5(a-5) of the Act (705 ILCS 405/5-401.5(a-5) (West 2016)) concerns statements obtained from a minor when subject to a custodial interrogation by "a law enforcement officer, State's Attorney, juvenile officer, or other public official or employee." The statute provides that the minor's statement is presumed to be inadmissible absent compliance with certain procedural safeguards prior to the commencement of a custodial interrogation by any of the specified individuals. 705 ILCS 405/5-401.5(a-5) (West 2016). The court found that the dean of a high school is a "public employee" so that, if the questioning constituted custodial interrogation, then section 5-401.5(a-5) of the Act applied. The court noted that, for purposes of section 5-401.5 of the Act, "custodial interrogation" means "any interrogation during which a reasonable person in the subject's position would consider himself or herself to be in custody and during which a question is asked that is reasonably likely to elicit [an incriminating] response." See 705 ILCS 405/5-401.5(a) (West 2016). Based on this definition, the court found that the questions asked of respondent by school personnel were clearly designed to elicit an incriminating response.

---

[2]People's exhibit No. 1, the *Miranda* form Officer Frey read to respondent at the police station, and respondent's exhibit No. 1, the security video of the library, were both admitted during the hearing but were withdrawn at the close of the hearing. The State has not made either exhibit part of the record on appeal.

¶ 12 Further, the court reasoned that a person in respondent's position would reasonably consider himself to be in custody, particularly in view of the facts that the deans waited for respondent at the bus stop, they took him to Dean Aiello's office, they held him for a period of time in the room used for student detentions, they escorted him from one room to another, Officer Frey patted down respondent without respondent's consent, and school personnel detained respondent while Officer Frey spent an additional 15 minutes obtaining and viewing the security video. The court found that, because respondent's rights were not read to him as required by section 5-401.5(a-5) of the Act, his statement was presumptively inadmissible.

¶ 13 The court noted that subsection (f) of section 5-401.5 provides that "[t]he presumption of inadmissibility of a statement made by a suspect at a custodial interrogation at a police station or other place of detention may be overcome by a preponderance of the evidence that the statement was voluntarily given and is reliable, based on the totality of the circumstances." 705 ILCS 405/5-401.5(f) (West 2016). The Act defines "place of detention" as

> "a building or a police station that is a place of operation for a municipal police department or county sheriff department or other law enforcement agency at which persons are or may be held in detention in connection with criminal charges against those persons or other allegations that those persons are delinquent minors." 705 ILCS 405/5-401.5(a) (West 2016).

Based on this definition, the court concluded that, because a school is not a "place of detention," there was no way to overcome the presumption of inadmissibility. The court added that, even if the school did constitute a "place of detention," the State had offered little to no evidence concerning the voluntariness of the statement and so the presumption, under the totality of the circumstances, was not overcome.

¶ 14 As for the interview at the police station, the court began by stating that to argue that it was "not [a] custodial interrogation is really beyond this Court's belief." The court noted that respondent was there for booking and fingerprinting and the processing of juvenile charges. Respondent had been brought into an interrogation room, he was read *Miranda* warnings, and he was questioned. There was no recording made, although one was required by statute (705 ILCS 405/5-401.5(b) (West 2016)). There was no other evidence presented as to the tone or manner of questioning. Thus, the State did not overcome the presumption of inadmissibility. As a result, both of respondent's statements were suppressed.

¶ 15 On February 16, 2018, the State filed a motion to reconsider the court's ruling. At the hearing on that motion, the State argued that the definition of "custodial interrogation" had not changed with the amendment to section 5-401.5(a-5) and that the court had misinterpreted that definition. The State argued that "custodial interrogation" refers only to police conduct, under *People v. Travis*, 2013 IL App (3d) 110170. Additionally, under *People v. Pankhurst*, 365 Ill. App. 3d 248 (2006), there was no police custodial interrogation and the issue was whether the school personnel were acting as agents of the police when they questioned respondent. The court denied the State's motion, remarking:

> "I disagree with the State's interpretation of the new statute. The new statute expounded [*sic*] protections for minors and *** extended those typical *Miranda* protections to include not only police officers or police agents but also now public officials or employees ***. Even the statute acknowledges that custodial interrogation could include by a public official or employee [*sic*], and that's what I found here."

The court reiterated that, as to both statements, a reasonable person in respondent's position would consider himself to be in custody and the questions asked were designed to elicit incriminating statements. On February 28, 2018, the State filed a certificate of impairment and a notice of appeal.

¶ 16                                    II. ANALYSIS

¶ 17        On appeal, the State argues that, for various reasons, the trial court improperly granted respondent's motion to suppress the statements he made at both the high school and the police station. In reviewing a trial court's ruling on a motion to suppress, we apply a two-part standard of review. *In re D.L.H.*, 2015 IL 117341, ¶ 46. Under this standard, the trial court's factual findings and credibility determinations are accorded great deference and will be overturned only if they are against the manifest weight of the evidence. *People v. Richardson*, 234 Ill. 2d 233, 251 (2009); *Pankhurst*, 365 Ill. App. 3d at 252. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or if the finding is unreasonable, arbitrary, or not based on the evidence presented. *In re Marriage of Kavchak*, 2018 IL App (2d) 170853, ¶ 65. However, we review *de novo* the ultimate issue of whether the evidence should be suppressed. *D.L.H.*, 2015 IL 117341, ¶ 46; *Pankhurst*, 365 Ill. App. 3d at 252.

¶ 18        Resolution of the issues presented also requires us to construe statutory language. Statutory construction is a question of law, subject to *de novo* review. *People v. Manning*, 2018 IL 122081, ¶ 16. The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature. *Village of Lake in the Hills v. Niklaus*, 2014 IL App (2d) 130654, ¶ 15. The most reliable indicator of legislative intent is the language of the statute itself, which should be given its plain and ordinary meaning. *Village of Lake in the Hills*, 2014 IL App (2d) 130654, ¶ 15. Only where the language of the statute is ambiguous, or where a literal interpretation of the statute would either lead to absurd results or thwart the goals of the statutory scheme, may a court look beyond the express language of the statute and consider extrinsic aids of construction. *Lansing v. Southwest Airlines Co.*, 2012 IL App (1st) 101164, ¶ 30; *NDC LLC v. Topinka*, 374 Ill. App. 3d 341, 359 (2007). With these principles in mind, we turn to the State's first argument.

¶ 19                        A. Statement at the High School

¶ 20        The State first argues that the trial court improperly granted respondent's motion to suppress the statement respondent made at the high school. The State's argument in this regard is twofold. Relying principally on *Pankhurst*, 365 Ill. App. 3d 248, and the cases cited therein, the State initially contends that, because the school personnel were not acting as agents of the police, respondent was not subject to a custodial interrogation at the high school. The State also contends that the trial court erred in concluding that the school personnel were "other public official[s] or employee[s]" and therefore required to comply with the procedural safeguards set forth in section 5-401.5(a-5) of the Act. Because we find the State's second argument dispositive, we confine our discussion to that matter.

¶ 21        Subsection (a-5) of section 5-401.5 was added to the Act by an amendment effective January 1, 2017. Pub. Act 99-882, § 10 (eff. Jan. 1, 2017) (amending 705 ILCS 405/5-401.5). Section 5-401.5(a-5) of the Act provides as follows:

"(a-5) An oral, written, or sign language statement of a minor, who at the time of the commission of the offense was under 18 years of age, is presumed to be inadmissible when the statement is obtained from the minor while the minor is subject to custodial interrogation by a law enforcement officer, State's Attorney, juvenile officer, or other public official or employee prior to the officer, State's Attorney, public official, or employee:

(1) continuously reads to the minor, in its entirety and without stopping for purposes of a response from the minor or verifying comprehension, the following statement: 'You have the right to remain silent. That means you do not have to say anything. Anything you do say can be used against you in court. You have the right to get help from a lawyer. If you cannot pay for a lawyer, the court will get you one for free. You can ask for a lawyer at any time. You have the right to stop this interview at any time.'; and

(2) after reading the statement required by paragraph (1) of this subsection (a-5), the public official or employee shall ask the minor the following questions and wait for the minor's response to each question:

(A) 'Do you want to have a lawyer?'

(B) 'Do you want to talk to me?' " 705 ILCS 405/5-401.5(a-5) (West 2016).

Thus, in this case, if the school personnel who questioned respondent at the high school were "other public official[s] or employee[s]" and respondent was subject to a "custodial interrogation," respondent's statement is presumed to be inadmissible unless he was read the statement and the questions set forth in subsections (a-5)(1) and (a-5)(2) of section 5-401.5. While section 5-401.5 of the Act defines "custodial interrogation" (see 705 ILCS 405/5-401.5(a) (West 2016)), it does not define the phrase "other public official or employee."

¶ 22    The trial court summarily concluded that school officials are "public employee[s]" for purposes of section 5-401.5(a-5) of the Act. The State argues that the trial court's determination was incorrect. The State acknowledges that the phrase "other public official or employee" as used in section 5-401.5(a-5) "seems *** unambiguous when given its plain and ordinary meaning." The State asserts, however, that because the plain and ordinary meaning of the phrase "other public official or employee" cannot be applied without leading to absurd and unjust results, the phrase is ambiguous. To resolve this ambiguity, the State invokes the doctrine of *ejusdem generis* and asserts that the word "other" in the phrase "other public official or employee" should be interpreted to mean "other such like." See *People v. Davis*, 199 Ill. 2d 130, 138 (2002) (discussing doctrine of *ejusdem generis*). The State argues that a school employee is not like a law enforcement officer, state's attorney, or juvenile officer in that the latter are "directly involved in the criminal justice and/or juvenile delinquency systems, whereas the primary role of school officials is the care of the students enrolled at their school." The State concludes that, since the school personnel at issue are not "other public official[s] or employee[s]" for purposes of section 5-401.5(a-5) of the Act, the trial court improperly suppressed the statement respondent made at the high school.

¶ 23    Respondent argues that the trial court properly found the school personnel in this case to be "other public official[s] or employee[s]" for purposes of section 5-401.5(a-5). According to respondent, the disputed phrase is *not* ambiguous, so there is no need to resort to extrinsic aids of construction. Respondent contends that the terms "public official" and "public employee" mean precisely what the plain language of those terms implies—either an elected or appointed

government official or an individual who is employed by a government agency. In support of his position, respondent discusses one case—*In re J.A.*, 85 Ill. App. 3d 567, 572-73 (1980) (observing that school officials are employees of the State)—and directs us to section 1-206 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1-206 (West 2016)), which defines a "local public entity" to include a school district. Respondent also points out that public school districts are funded by public monies and that persons holding positions within a school district receive paychecks provided by public funds.

¶ 24    As noted above, section 5-401.5(a-5) does not define the phrase "other public official or employee." In the absence of a statutory definition, a court may consult a dictionary to ascertain the plain and ordinary meaning of a term. *People v. Perry*, 224 Ill. 2d 312, 330 (2007). A "public official" is defined as "[s]omeone who holds or is invested with a public office; a person elected or appointed to carry out some portion of a government's sovereign powers." Black's Law Dictionary (10th ed. 2014) (defining "official" but noting that the word is also termed "public official"). The term "public employee" is defined as "[s]omeone employed in a department responsible for conducting the affairs of a national or local government." Black's Law Dictionary (10th ed. 2014) (defining "civil servant" but noting that the phrase is also termed "public employee"). These dictionary definitions are consistent with the meanings the legislature has ascribed to these terms in other statutes. See, *e.g.*, 30 ILCS 245/1(a) (West 2016) (the Payment for Governmental Services Act, defining "public official" as "any person who occupies any office, position or employment in the government of the State of Illinois or any county, municipality or political subdivision thereof, or any school district, or special district, or any authority, commission, board, or any branch or agency of public service" and noting that the term "includes persons either elected or appointed"); 720 ILCS 5/2-17 (West 2016) (the Criminal Code of 2012, defining "public employee" as "a person, other than a public officer, who is authorized to perform any official function on behalf of, and is paid by, the State or any of its political subdivisions"); 745 ILCS 10/1-206, 1-207 (West 2016) (the Local Governmental and Governmental Employees Tort Immunity Act, defining "public employee" as "an employee of a local public entity," including a school district); 775 ILCS 5/5-101(C) (West 2016) (the Illinois Human Rights Act, defining "public official" as "any officer or employee of the state or any agency thereof, including state political subdivisions, municipal corporations, park districts, forest preserve districts, educational institutions, and schools").

¶ 25    A statute is ambiguous if it is capable of more than one reasonable interpretation. *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 11. Given the plain and ordinary meanings of the terms "public official" and "public employee," as well as the legislature's consistent use of similar definitions for the same terms in other statutes, we conclude that the phrase "other public official or employee" is not, on its face, susceptible to more than one reasonable interpretation. Quite simply, as used in section 5-401.5(a-5) of the Act, an "other public official or employee" is an individual, other than those specifically listed, who is elected or appointed to hold a government office or who is employed by a government agency.

¶ 26    That the language of section 5-401.5(a-5) is unambiguous on its face does not end our inquiry. Our supreme court has stated that, " 'where a literal enforcement of a statute would result in great injustice or absurd consequences, courts are bound to presume that such consequences were not intended and to adopt a construction which, it is reasonable to assume, was contemplated by the legislature.' " *Penkava v. Kasbohm*, 117 Ill. 2d 149, 154 (1987)

(quoting *People ex rel. Community High School District No. 231 v. Hupe*, 2 Ill. 2d 434, 448 (1954)). According to the State, requiring *every* public official and employee to comply with section 5-401.5(a-5) prior to taking a statement from a minor "would result in absurdity and injustice." We agree. Take the school setting involved in this case. School districts employ hundreds of individuals in a wide variety of positions, including superintendent, principal, dean, teacher, librarian, administrative assistant, classroom aide, nurse, janitor, bus driver, lunchroom personnel, crossing guard, and recess monitor. Under a literal interpretation of the phrase, each of these individuals would be required to comply with the procedural safeguards set forth in section 5-401.5(a-5). Consider, for example, a bus driver transporting middle-school children home at the end of the school day. While exiting the bus, student A informs the bus driver that student B possesses an illegal substance. The bus driver prevents student B from leaving the bus until he or she answers questions about the allegation. During their conversation, Student B admits to possessing the substance. A literal interpretation of the statute would require the bus driver to read the statement and questions set forth in subsections (a-5)(1) and (a-5)(2) prior to questioning student B. Likewise, a literal interpretation of the statute would require compliance by a janitor who questions a student after observing the student falsely pull a fire alarm or a lunchroom employee who questions a student after observing the student steal food from the cafeteria. Such an interpretation of the statute would create a seismic shift in public policy by placing on individuals outside the realm of law enforcement the responsibility of learning and employing procedural safeguards heretofore required only of law enforcement officers. We find it implausible that the legislature intended the phrase "other public official or employee" as used in section 5-401.5(a-5) to have such a broad scope in the absence of an express definition of the phrase. In fact, during oral argument, respondent's attorney conceded that a literal interpretation of the statute "could extend to the absurd," even citing a bus driver as an example. Because a literal interpretation of the statute would lead to absurd consequences, we must consider extrinsic aids of construction to ascertain the legislature's intent. See *In re B.C.*, 176 Ill. 2d 536, 542-43 (1997) ("[W]here the meaning of a statute is unclear from the statutory language itself, a court may look beyond the language employed and consider the purpose of the law, the evils the law was designed to remedy [citation], as well as the legislative history to discern legislative intent [citation].").

¶ 27    As noted previously, effective January 1, 2017, the General Assembly amended section 5-401.5 of the Act to add subsection (a-5). Pub. Act 99-882, § 10 (eff. Jan. 1, 2017) (amending 705 ILCS 405/5-401.5). Public Act 99-882 began as Senate Bill 2370 (99th Ill. Gen. Assem., Senate Bill 2370, 2016 Sess.). Introduced on January 28, 2016, by Senator Van Pelt, Senate Bill 2370, as originally drafted, did not include subsection (a-5). 99th Ill. Gen. Assem., Senate Proceedings, January 28, 2016, at 6. During debate on the bill prior to the adoption of the amendment adding subsection (a-5), Senator Van Pelt expressed concern about false confessions by children at the hands of law enforcement personnel. 99th Ill. Gen. Assem., Senate Proceedings, April 14, 2016, at 53-56 (statements of Senator Van Pelt). She commented:

    "Also to note that currently our police officers are even—are allowed to use deception in interrogating children. The courts have upheld waivers of lawyers by children. Even when the police misrepresent the evidence and deceive the child, the Supreme Court has held that the deception is not *per se* unlawful and the use of deception or subterfuge does not alone invalidate a confession. Now, any of us know that if we have a fourteen-

year-old that is up against a veteran police officer with twenty years of experience and he comes and begins to use psychological interrogation tactics, that our children are more likely than not [*sic*] going to be able to—stand under that type of pressure, and being afraid and many of them being intimidated will confess to crimes." 99th Ill. Gen. Assem., Senate Proceedings, April 14, 2016, at 54 (statements of Senator Van Pelt).

Senator Van Pelt explained that the purpose of the legislation was to "ensure[ ] that all children subject to custodial interrogation in a homicide case will have a lawyer." 99 Ill. Gen. Assem., Senate Proceedings, April 14, 2016, at 53 (statements of Senator Van Pelt). Following further discussion, Senator Van Pelt agreed to take the bill "out of the record" to discuss possible alternative language. 99th Ill. Gen. Assem., Senate Proceedings, April 14, 2016, at 56-63 (statements of Senators Van Pelt, Righter, and Radogno).

¶ 28    On May 4, 2016, Senator Van Pelt filed senate amendment No. 3 to the bill. Among other things, that amendment added subsection (a-5). During debate in the senate the following day, Senator Van Pelt reiterated that the General Assembly has a responsibility to protect juveniles from being coerced into false confessions. 99th Ill. Gen. Assem., Senate Proceedings, May 5, 2016, at 53 (statements of Senator Van Pelt). Senator Van Pelt noted that, as originally proposed, Senate Bill 2370 would have required a lawyer to be present for a minor between the ages of 13 and 17 subject to a custodial interrogation for homicide. 99th Ill. Gen. Assem., Senate Proceedings, May 5, 2016, at 53 (statements of Senator Van Pelt). As amended, the bill required any minor 14 years old or younger who is charged with homicide or a sex offense to be represented by a lawyer during a custodial interrogation. 99th Ill. Gen. Assem., Senate Proceedings, May 5, 2016, at 53 (statements of Senator Van Pelt). Senator Van Pelt further noted that the amended bill also provided that "a simplified version of the *Miranda* warning be given to minors under the age of eighteen" and required the videotaping of a custodial interrogation of a minor charged with either a misdemeanor sex offense or any felony offense. 99th Ill. Gen. Assem., Senate Proceedings, May 5, 2016, at 54 (statements of Senator Van Pelt). Senator Radogno commented that the amended bill would be the first in the country to include the juvenile *Miranda* language. 99th Ill. Gen. Assem., Senate Proceedings, May 5, 2016, at 55 (statements of Senator Radogno). Senator Van Pelt later remarked that, although the simplified *Miranda* language was included in the final bill, it had "little power" because the individual reading the warning would be the same individual prosecuting the juvenile or trying to get the juvenile to confess. 99th Ill. Gen. Assem., Senate Proceedings, May 5, 2016, at 57 (statements of Senator Van Pelt). As amended, Senate Bill 2370 passed the senate 56-0. 99th Ill. Gen. Assem., Senate Proceedings, May 5, 2016, at 57-58.

¶ 29    The first reading of Senate Bill 2370 in the Illinois House of Representatives occurred on May 10, 2016. 99th Ill. Gen. Assem., House Proceedings, May 10, 2016, at 17. The only reference to subsection (a-5) was from Representative Currie, during the third reading of the bill. Representative Currie noted that the bill "simplifies the *Miranda* warning for people up to the age of 18 since a lot of research shows that young people don't understand the right to waive their opportunity to have a lawyer or waive their opportunity to speak. They often think that if they do anything like that the judge will hold it against them." 99th Ill. Gen. Assem., House Proceedings, May 26, 2016, at 87 (statements of Representative Currie). The bill passed the Illinois House of Representatives 112-0. 99th Ill. Gen. Assem., House Proceedings, May 26, 2016, at 88.

¶ 30    As is evident from the discussion in the three preceding paragraphs, the legislative history of Senate Bill 2370 reveals that the legislature was concerned about juveniles understanding their rights and not being subject to undue influence. And while Senator Van Pelt's comments suggest that the statute was aimed at law enforcement officials, the remarks from the legislative debates do not expressly address the intended scope of the phrase "other public official or employee" as used in section 5-401.5(a-5) of the Act.

¶ 31    Because the legislative history is of little assistance, we turn to other tools of statutory construction. Respondent posits that the evil to be remedied here is the violation of children's constitutional rights and the possibility that they would be manipulated into making incriminatory statements because of their youth and immaturity. Respondent then concludes that "[w]here there is the possibility that initial questioning of students accused of committing offenses on school grounds falls onto the shoulders of public school officials or employees, then it becomes clear that those individuals should be guided by the efforts of the legislature in protecting the children from making incriminatory or falsely incriminatory statements." However, we find no express or implied indication in the legislative debates that the phrase "other public official or employee" as used in section 5-401.5(a-5) was intended to apply to public school officials or employees.

¶ 32    The State suggests that we invoke the doctrine of *ejusdem generis* to resolve this ambiguity. "The doctrine of *ejusdem generis* provides that when a statutory clause specifically describes several classes of persons or things and then includes 'other persons or things,' the 'other' is interpreted as meaning 'other such like.' " *Davis*, 199 Ill. 2d at 138 (quoting *Farley v. Marion Power Shovel Co.*, 60 Ill. 2d 432, 436 (1975)). We agree that the use of this doctrine brings clarity to the language at issue.

¶ 33    In listing who is required to provide a *Miranda* warning to juveniles subject to custodial interrogation, the legislature specifically named three classes of individuals—"law enforcement officer," "State's Attorney," and "juvenile officer"—followed by an additional class labeled as "other public official or employee." 705 ILCS 405/5-401.5(a-5) (West 2016). Under the doctrine of *ejusdem generis*, the phrase "other public official or employee" would refer to individuals "such like" those specifically enumerated in the statute. A law enforcement officer, state's attorney, and juvenile officer all have as their primary duties the protection of the public interest and the enforcement of the law. See, *e.g.*, 50 ILCS 727/1-5 (West 2016) (defining "law enforcement officer" as "any person employed by a State, county, or municipality as a policeman, peace officer, or in some like position involving the enforcement of the law and protection of public interest at the risk of the person's life"); Black's Law Dictionary (10th ed. 2014) (defining "law-enforcement officer" as "[a] person whose duty is to enforce the laws and preserve the peace"); 55 ILCS 5/3-9005(a)(1) (West 2016) (listing, among the duties of the state's attorney, "[t]o commence and prosecute all actions, suits, indictments and prosecutions, civil and criminal, in the circuit court for his county, in which the people of the State or county may be concerned"); 705 ILCS 405/1-3(17) (West 2016) (defining "juvenile police officer" as "a sworn police officer who has completed a Basic Recruit Training Course, has been assigned to the position of juvenile police officer by his or her chief law enforcement officer and has completed the necessary juvenile officers training as prescribed by the Illinois Law Enforcement Training Standards Board, or in the case of a State police officer, juvenile officer training approved by the Director of the Department of State Police"); see also *In re Navajo County Juvenile Action No. JV91000058*, 901 P.2d 1247, 1249

(Ariz. Ct. App. 1995) (holding that law enforcement agents include government employees whose primary purpose is to enforce the law); *In re Victor F.*, 169 Cal. Rptr. 455, 458 (Ct. App. 1980) (holding that a school principal and teacher were not officials whose interrogation of a criminal suspect must be preceded by an admonition of *Miranda* rights in that such individuals are not employed by a governmental entity whose primary mission is to enforce the law). Thus, applying the doctrine of *ejusdem generis* in this case, we hold that the phrase "other public official or employee" as used in section 5-401.5(a-5) is intended to refer to an elected or appointed government official or an employee who works for a government agency and who has as his or her primary duties the protection of the public interest and the enforcement of the law. While Deans Reagan and Aiello and Assistant Principal Pikul are undoubtedly responsible for administration and discipline within Lake Zurich High School (see 105 ILCS 5/24-24 (West 2016) (granting educators *in loco parentis* status, which extends to both disciplinary and nondisciplinary matters); *In re E.M.*, 262 Ill. App. 3d 302, 307 (1994)), they do not have as their primary mission the same duties as the individuals specifically listed in section 5-401.5(a-5). See *People v. Dilworth*, 169 Ill. 2d 195, 221-22 (1996) (Nickels, J., dissenting) (recognizing that school districts and law enforcement authorities have different missions); *Pankhurst*, 365 Ill. App. 3d at 255 (emphasizing that, although school officials are charged with maintaining order and discipline in their schools, the fact that these duties occasionally entail the investigation of criminal conduct does not alone make the school officials agents of the police); see also 2 Wayne R. LaFave *et al.*, Criminal Procedure § 6.10(c) (4th ed. 2017) (noting that courts have generally held that government agents not primarily charged with enforcement of the criminal law are under no obligation to comply with *Miranda*); *Commonwealth v. Ira I.*, 791 N.E.2d 894, 900-01 (Mass. 2003) (holding that school officials acting within the scope of their employment rather than as agents of law enforcement are not required to give *Miranda* warnings prior to questioning a student in conjunction with a school investigation); *Navajo County*, 901 P.2d at 1249 (concluding that school principals are not law enforcement agents); *Victor F.*, 169 Cal. Rptr. at 458 (finding that school personnel have no more powers to enforce the law than private persons). Under this interpretation, the scope of the phrase "other public official or employee" goes from extremely broad to reasonably focused. Thus, applying this definition, we hold that the school personnel in this case were not "other public official[s] or employee[s]" and therefore not required to precede their questioning of respondent with the statement and questions set forth in section 5-401(a-5).

¶ 34     Respondent contends that the application of the doctrine of *ejusdem generis* renders the phrase "other public official or employee" superfluous. According to respondent, the statute already lists the relevant law enforcement personnel who would be involved in a criminal investigation of a juvenile—the police, the state's attorney, and juvenile officers. As respondent correctly notes, one tool of statutory construction instructs that a statute must be interpreted so that each word, clause, and sentence is given reasonable meaning and not rendered superfluous. *Oswald v. Hamer*, 2018 IL 122203, ¶ 10. Nevertheless, we disagree with respondent's argument that the application of the doctrine of *ejusdem generis* renders the phrase "other public official or employee" superfluous. There are other public officials or employees who are not expressly enumerated in the statute, whose primary duties involve law enforcement, and who could be involved in a criminal investigation of a juvenile, such as a state's attorney investigator or an arson investigator with the Office of the State Fire Marshal

(see 20 ILCS 2910/1(b) (West 2016)). Accordingly, we reject respondent's argument that our interpretation of the phrase "other public official or employee" renders the phrase superfluous.

¶ 35    In short, we find that, although the phrase "other public official or employee" as used in section 5-401.5(a-5) is not ambiguous on its face, a literal reading of the phrase renders the absurd result of applying the statute to every individual who is elected or appointed to hold a government office or who is employed by a government agency. Employing the doctrine of *ejusdem generis*, however, we hold that the phrase "other public official or employee" as used in section 5-401.5(a-5) was intended to apply to an elected or appointed government official or an employee who works for a government agency and who has as his or her primary duties the protection of the public interest and the enforcement of the law. Because the school personnel in this case did not have as their primary duties the protection of the public interest and the enforcement of the law, they were not "other public official[s] or employee[s]" for the purposes of section 5-401.5(a-5) and they were not required to comply with the procedural safeguards set forth in the statute. Accordingly, we reverse that portion of the trial court's judgment suppressing the statement respondent made to the school personnel at the high school.

¶ 36                              B. Statement at the Police Station

¶ 37    The State also argues that the trial court improperly granted respondent's motion to suppress the statement he made at the police station, on the basis that respondent was not "in custody" when he spoke to Officer Frey.

¶ 38    The recording requirement set forth in section 5-401.5(b) of the Act (705 ILCS 405/5-401.5(b) (West 2016)) applies only to a custodial interrogation conducted at a police station or "other place of detention." Specifically, the statute provides:

> "(b) An oral, written, or sign language statement of a minor who, at the time of the commission of the offense was under the age of 18 years, made as a result of a custodial interrogation conducted at a police station or other place of detention on or after the effective date of this amendatory Act of the 99th General Assembly shall be presumed to be inadmissible as evidence against the minor in any criminal proceeding or juvenile court proceeding, for any act that if committed by an adult would be a misdemeanor offense under Article 11 of the Criminal Code of 2012 or any felony offense unless:
>
>        (1) an electronic recording is made of the custodial interrogation; and
>
>        (2) the recording is substantially accurate and not intentionally altered." 705 ILCS 405/5-401.5(b) (West 2016).

Subsection (f) of section 5-401.5 allows for the presumption of inadmissibility to be overcome "by a preponderance of the evidence that the statement was voluntarily given and is reliable, based on the totality of the circumstances." 705 ILCS 405/5-401.5(f) (West 2016).

¶ 39    In this case, it is undisputed that respondent was under the age of 18 years when the alleged offenses were committed and that the statement at issue was made at a police station. It is also undisputed that the petition for adjudication of wardship charged respondent with acts that, if committed by an adult, would be felony offenses. See 720 ILCS 570/402(c) (West 2016) (categorizing unlawful possession of a controlled substance as a Class 4 felony); 720 ILCS 570/407(b)(5) (West 2016) (categorizing delivery of a controlled substance as a Class 2 felony). Thus, if respondent's statement at the police station was made as a result of a

"custodial interrogation," the statement is presumptively inadmissible against him in any criminal or juvenile court proceeding unless an electronic recording was made of the custodial interrogation. 705 ILCS 405/5-401.5(b) (West 2016).

¶ 40    The State maintains that the statutory recording requirement did not apply in this case because respondent was not "in custody" when Officer Frey and respondent spoke at the police station. In support of its argument, the State observes that the interview was "set in advance," respondent's mother was present during the entire interview, the questioning lasted for less than an hour, and Officer Frey was dressed in plain clothing. The State further asserts that the only fact that lends itself to a finding that respondent was in custody was that respondent was booked. The State's position lacks merit.

¶ 41    Whether someone is "in custody" is a question of fact. *People v. Calhoun*, 382 Ill. App. 3d 1140, 1146 (2008); *People v. Wheeler*, 281 Ill. App. 3d 447, 458 (1996). As such, we must defer to the trial court's finding unless it is against the manifest weight of the evidence. *Richardson*, 234 Ill. 2d at 251. As noted above, a finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or if it is unreasonable, arbitrary, or not based on the evidence presented. *Kavchak*, 2018 IL App (2d) 170853, ¶ 65. In this case, the trial court found that Officer Frey's interview constituted a custodial interrogation. Given the applicable standard of review, we cannot say that the trial court's finding is against the manifest weight of the evidence. Subsection (a) of section 5-401.5 defines "custodial interrogation" as "any interrogation (i) during which a reasonable person in the subject's position would consider himself or herself to be in custody and (ii) during which a question is asked that is reasonably likely to elicit an incriminating response." 705 ILCS 405/5-401.5(a) (West 2016). The factors relevant to determining whether an individual is in custody include (1) the location, time, length, mood, and mode of questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or use of force, physical restraint, booking, or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the individual. *People v. Slater*, 228 Ill. 2d 137, 150 (2008).

¶ 42    Turning to the evidence before us, the record establishes that, on April 6, 2017, respondent was a 16-year-old high-school student. Following questioning at the high school, Officer Frey informed respondent and his family that Officer Frey would be in contact to arrange a date for respondent to come to the police station for booking. Respondent's mother testified that Officer Frey later contacted her to request that she bring respondent to the police station to answer some questions and to be fingerprinted. In accordance with this request, respondent and his mother reported to the police station on April 13, 2017. At that time, respondent had just turned 17. Once the translating officer arrived, Officer Frey escorted respondent, his mother, and the translating officer to an interview room adjacent to the lobby of the police station. Officer Frey then read respondent the juvenile *Miranda* form and questioned him for 15 minutes regarding the incident at the school. Although Officer Frey testified that the interview room was unlocked and accessible to the public, he acknowledged that he uses this particular room to interview suspects before taking them into custody. Two officers were present during the questioning (Officer Frey and the translating officer), and there was fingerprinting equipment in the room. Moreover, although Officer Frey was dressed in plainclothes, he was

armed with his duty pistol and carrying handcuffs. At the conclusion of the interview, Officer Frey took respondent to a secure area for booking and fingerprinting.

¶ 43 Under the totality of these circumstances, a reasonable person would have considered himself to be in custody and not free to leave. In particular, we observe that Officer Frey directed respondent's mother to bring respondent to the police station to answer some questions and be fingerprinted. Although respondent's mother was present during the questioning, so were two police officers. At least one of the officers was armed with his duty pistol and had handcuffs. Officer Frey read respondent the juvenile *Miranda* form prior to the questioning. At the conclusion of the interview, respondent was booked and fingerprinted. We also observe that Officer Frey admitted that he was seeking incriminating information from respondent and that respondent was at the police station so that he could be booked and processed on two drug-related felony charges. Given the foregoing, we find ample evidence to support the trial court's finding that respondent was subject to a custodial interrogation at the police station. Since this finding is not against the manifest weight of the evidence and since the custodial interrogation was not electronically recorded as required by section 5-401.5(b) of the Act, the statement respondent made at the police station is presumptively inadmissible.

¶ 44 The State alternatively asserts that, even if respondent was "in custody" when he spoke to Officer Frey at the police station, the statement he provided was voluntary. As noted, subsection (f) of section 5-401.5 allows for the presumption of inadmissibility to be overcome "by a preponderance of the evidence that the statement was *voluntarily given and is reliable*, based on the totality of the circumstances." (Emphasis added.) 705 ILCS 405/5-401.5(f) (West 2016). In this case, although the State argues that the statement respondent provided at the police station was voluntary, it makes no claim that the statement was reliable. See *People v. Whitfield*, 2017 IL App (2d) 140878, ¶ 97 (noting that the issue of reliability must be considered separately from voluntariness); *People v. Harris*, 2012 IL App (1st) 100678, ¶ 66 (emphasizing that whether the defendant's statement was reliable is a separate inquiry from whether it was voluntary). The failure to provide argument as to both prongs of subsection (f) results in forfeiture of the State's claim that it had overcome the presumption of inadmissibility. Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) (providing that an appellant's brief must include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"); *In re Marriage of Woodrum*, 2018 IL App (3d) 170369, ¶ 63 (noting that failure to develop an argument and provide any authority in support of a contention results in forfeiture of the issue on appeal).

¶ 45                                        III. CONCLUSION

¶ 46 For the reasons set forth above, we affirm that portion of the judgment of the circuit court of Lake County granting respondent's motion to suppress the statement respondent made at the police station but reverse that portion of the judgment granting respondent's motion to suppress the statement respondent made at the high school. This cause is remanded for further proceedings consistent with this opinion.

¶ 47 Affirmed in part and reversed in part.

¶ 48 Cause remanded.